THE STATE OF OHIO, APPELLEE,
*v.* JOHNSON, APPELLANT.*

[Cite as State v. Johnson (1977), 60 Ohio App. 2d 45.]

(No. C-76437—Decided November 9, 1977.)

*Mr. Simon L. Leis, Jr., Mr. William E. Breyer* and *Mr. Joseph G. Carr,* for appellee.

*Mr. John Andrew West* and *Mr. Allen Schwartz,* for appellant.

*Per Curiam.* This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Court of Common Pleas of Hamilton County, Ohio, the transcript of the proceedings, the assignments of error, the briefs and the arguments of counsel.

On November 1, 1975, 61 year old Otto Baum arrived at an apartment building he owned at 215 East University Avenue in Cincinnati to collect the monthly rents from his tenants. As was his customary practice, Baum first visited the tenants residing on the ground and second floor apartments, cashed checks for them and collected their rent money. He then walked up a flight of stairs to the third floor apartment of Willie Johnson, the appellant, and knocked on his door. Appellant and his brother, Bobby Johnson, sprang from their hiding place behind an attic door and ordered Baum to hand over his wallet. Both assailants were wearing ski masks and the appellant was armed with a sawed-off

---

*The judgment in this case was affirmed by the Supreme Court of Ohio as to the conviction only, in 56 Ohio St. 2d 35.

shotgun that was cocked and ready to fire. When Baum futilely attempted to grab the weapon, a struggle ensued which ended when appellant twice smashed the rifle into the left side of Baum's skull. Baum slumped to the stairs and appellant then handcuffed his right arm to the banister railing, took his wallet containing approximately $500 and fled the building with his brother.

A life squad unit which had been summoned by a resident of the building arrived a short time later and transported the vomiting and bleeding victim to nearby General Hospital. Upon his admittance to the hospital, Baum was still conscious, although unable to communicate, but his condition rapidly worsened during the day. By evening he had lapsed into a coma and his right side was almostly completely paralyzed. X-rays revealed numerous skull fractures[1] and a blood clot that was expanding and pressing against Baum's brain. The attending physician, Dr. Walus, decided that surgery was immediately required to remove the clot.

Surgery began at 1 a.m. on November 2 and lasted four to five hours. Although the blood clot was successfully removed, Baum bled profusely during the operation and suffered a brief cardiac arrest. Manual resuscitation restored his heartbeat and respiration only seconds after the arrest, but huge amounts of blood for transfusion were required to maintain adequate blood pressure. It was not known how much time elapsed before circulation was restored, and the extent of damage, if any, to the brain resulting from oxygen loss was indeterminable.[2]

Following the surgery, a test designed to monitor the electrical activity in Baum's brain was conducted and showed no activity whatsoever; *i.e.*, the patient's brain had permanently ceased to function. On the morning of November 2, Dr. Walus wrote in his notes, "No hope for recovery now."

---

[1]Dr. Michael Walus, chief neurosurgery resident at Cincinnati General Hospital and the physician who examined and later operated on Baum, testified that the skull had been "*** shattered and radiated out, much the way a window pane shatters with many small fractures."

[2]Prevailing medical opinion holds that if cessation of *heart beat* persists at normal body temperature for more than eight to ten minutes, then brain death has occurred. *Wasmuth, The Concept of Death,* 30 Ohio St. L. J. 32, 37 (1969), citing F. Moore, *Give and Take* 132 (1964).

With a respirator machine regulating his breathing and supplying oxygen, Baum lay in this comatose state for several more days. His condition never changed. At 12:40 p.m. on November 6, after consultation with Baum's immediate family, Dr. Walus discontinued the supplemental oxygen that Baum was receiving through the respirator. Baum's blood pressure began to weaken and moments later his heart stopped. He was pronounced dead by an associate of Dr. Walus' at 1:03 p.m.

Appellant and his brother were both indicted by the Hamilton County Grand Jury for aggravated murder (including a specification of aggravating circumstances) and aggravated robbery, violations of R.C. 2903.01 and 2911.01, respectively. The cases were tried separately before juries.

Appellant's brother was found not guilty of aggravated murder, guilty of the lesser included offense of involuntary manslaughter and guilty of aggravated robbery. He received concurrent sentences of six to twenty-five years in the Ohio Reformatory.

Appellant was convicted of the original charges of aggravated murder and aggravated robbery. The trial court, finding that no mitigating factors had been shown, sentenced appellant to death on the murder charge and to a term of seven to twenty-five years on the aggravated robbery charge. In this appeal, he challenges the aggravated murder conviction and the imposition of the death sentence therefor.

Appellant's first two assignments of error, which revolve around the same issue, will be consolidated for the purposes of discussion herein. They state as follows:

I. "The Trial Court Substantially Erred to the Prejudice of the Appellant When it Denied the Appellant's Motion for Judgment of Acquittal pursuant to Criminal Rule 29."

II. "The Verdict of the Jury was Against the Manifest Weight of the Evidence."

The argument advanced under these two assignments is that the state failed to prove that Otto Baum's death was caused by appellant. While conceding his participation in the robbery and beating of Baum, appellant nevertheless asserts that his acts were not the proximate cause of Baum's death.

In essence, he contends that the trial court should have held as a matter of law that Dr. Walus' act in ceasing to supply supplemental oxygen to Baum was an independent intervening cause of death. He argues that since "brain death" is not "death" in Ohio, Baum was "alive" until Dr. Walus acted and it was this act of Dr. Walus which proximately caused "clinical death." Appellant advances the same argument in support of the proposition that the verdict is contrary to the manifest weight of the evidence. To understand appellant's theory, some discussion of the state of the law on "death" is helpful.

There are presently no statutory provisions in the Ohio Revised Code which define death. Case law discloses a similar dearth of authority. The only reported decision which even alludes to the subject was *In re Myers* (1925), 26 N.P. (N.S.) 57, dealing with the construction of the words "contemplation of death" under Ohio's inheritance tax statutes. In the opinion, at page 64, Judge Graven, by way of dictum, defined death as " *** cessation of life; that state of being animal or vegetable, in which there is a total and permanent cessation of all vital functions." Judge Graven's view of death comports with the traditional legal definition which has been widely recognized throughout the United States.[3]

Historically, the concept of clinical death embraced by the medical and legal professions has not included any criteria relating to brain activity. Death was regarded as the irreversible cessation of all vital functions, primarily respiration, circulation and heart beat, and its occurrence was marked by an instant or moment in time.[4] Advances in medicine during the past several decades have rendered suspect these traditional criteria of death. Today the medical profession almost universally regards death as a continuing process which progresses through several distinct steps.[5] Modern medicine has made it

---

[3]See, for example, the definition of death set forth in Black's Law Dictionary. (rev. 4th ed. 1968): "The cessation of life; the ceasing to exist, defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc."

[4]*Friloux, Death, When Does It Occur?* 27 Baylor L. Rev. 10 (1975).

[5]In 1968 the Twenty-Second World Medical Assembly adopted a definition of death known as the Declaration of Sydney. It stated in part: "[D]eath is a gradual process at the cellular level with tissues varying in their ability to withstand depriva-

possible for physicians not only to diagnose brain death but also, paradoxically, to keep a patient, who has no chance of ever again functioning as a rational being with a human spirit and soul, "alive" through artificial means.

In most states these developments have not yet been followed by corresponding changes in the Medico-legal determination of death. Although numerous jurisdictions are currently studying the need for a broader definition of death, only nine states have recognized the brain death concept in

---

tion of oxygen." See Wecht, *Medical-Legal Ramifications of Human Tissue Transplantation,* 18 Depaul L. Rev. 488, 493 (1969).

An informative description of the stages of death appears in Hirsh, *Brain Death,* (1975), Med. Trial Tech. Q. 377, 378-379, quoted in part below:

"As a first consideration it must be realized that there is no specific moment of dying. Man dies in stages. During the ebbing of life there is an orderly progression from clinical death to brain death, to biological death, to cellular death. Clinical death occurs when the body's vital functions-respiration and circulation-cease. When the brain is deprived of oxygen because of cessation of blood circulation, brain death is inevitable. Brain death follows clinical death almost immediately unless resuscitative procedures are started promptly, since the human brain under normal temperatures cannot survive loss of oxygen for more than six to ten minutes at most. If resuscitative measures are instituted at the moment of clinical death, life may be restored and the patient may recover fully. On the other hand 'brain death' eventually may happen in hours, days, or weeks, despite reanimation efforts.

"The brain also dies in progressive steps. First the cerebral cortex, the site of the highest centers, ceases to function. Then successively, the cerebellum (older part of brain developmentally, having to do with equilibrium) and the so-called lower brain areas. Ultimately the brain stem with the vital centers (controlling respiration, heart rate and blood pressure) dies. If there is irreversible destruction of the higher centers of the brain without damage to the vital centers, there is permanent loss of consciousness, but cardiorespiratory functions can go on. Sometimes these continue unaided, but most times only with artifical assistance, machines, equipment, and devices. When the lower areas of the brain are irreversibly damaged, in addition to the cerebrum (Hemispheres of higher centers), it still may be possible to maintain cardiovascular function for some time through stimulation of local vasomotor reflexes (nerves controlling blood vessels).

"Ultimately, when all the components of the brain are dead, biological death, or permanent extinction of bodily life occurs. Thereafter the process of cellular death begins, and, because of differences in cellular composition, the death of different parts of the body occurs at different times and stages. That is why viable organs such as the heart or kidneys can be removed immediately after biological death and be transplanted. They can live and function in a recipient. This also accounts for the fact that even after biological death, organs within the lifeless body can be kept going for a time by means of mechanical and chemical sustainers."

their code law.[6] Efforts by the organized bar will probably bring about more changes in the near future. In 1975, the American Bar Association House of Delegates approved the following definition of death:

" 'For all legal purposes, a human body with irreversible total cessation of brain function, according to usual and customary standards of medical practice, shall be considered dead.' "[7]

The ABA definition is currently before the Commissioners of Uniform Laws for the drafting of a uniform definition of death for all states.

Thus, while the present trend is toward adoption of some phase of the general "brain death" theory, most states, including Ohio, have not yet altered the traditional common law approach that death means the permanent cessation of all vital functions and the fact and time of its occurrence are questions for the jury. From the premise that one is not dead under Ohio law until "clinically dead," appellant concludes that Otto Baum was legally "alive" on November 6, 1975, even though his brain was dead, and therefore the *cause* of death was Dr. Walus' removal of the supplemental oxygen supply. The obvious flaw in this argument is that Baum did not reach the point where Dr. Walus stopped administering oxygen by accident. He reached it because of defendant's act. A result may have more than one "cause." On the evidence, the most that can be said is that a jury question was presented as to the cause of Baum's death. The court did not err in refusing to grant appellant's motion to acquit on the ground that Dr. Walus' act was an independent intervening cause as a matter of law. As elaborated hereafter, the

---

[6]Alaska, California, Kansas, Maryland, Michigan, New Mexico, Oklahoma, Virginia and West Virginia. Charron, *Death: A Philosophical Perspective on the Legal Definitions,* 1975 Wash. Univ. L. Q. 979, 980.

Kansas' death statute, the first one passed, is representative in most respects of the language used in the other eight. It reads:

"77-202 Definition of death. A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous respiratory and cardiac function and, because of the disease or condition which caused, directly or indirectly, these functions to cease, or because of the passage of time since these functions ceased, at-

evidence was overwhelming that the blows Baum received from appellant were the cause of his death. What Dr. Walus did was to cease administering extraordinary measures to preserve life. His act could not conceivably be deemed the sole proximate cause of Baum's death. It would have to have been such for the court to find it an independent intervening cause as a matter of law.

Was there evidence from which the jury could conclude beyond a reasonable doubt that appellant did, in fact, cause the death of Otto Baum? The answer must be yes. Every lay witness who observed Baum shortly after the attack testified that he was critically injured even before he arrived at General Hospital. Once there, his condition deteriorated rapidly to the point where surgery was necessary if he were to have any chance for survival. Although the operation was successful in removing the immediate danger posed by the blood clot, it failed to reverse the gradual collapse of Baum's central nervous system caused by the injuries to his brain.

Both witnesses who testified as medical experts for the state agreed on the cause of death. Dr. Walus stated that Baum died from "massive head trauma." Dr. Robert Ritterhoff, the deputy coroner of Hamilton County and the individual who performed the autopsy on Baum, testified that the cause of death was "skull fracture*** caused by external force." At the time of the autopsy, which was conducted less than three hours after Baum's death, Dr. Ritterhoff "***saw

---

tempts at resuscitation are considered hopeless; and, in this event, death will have occurred at the time these functions ceased; or

"A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous brain function; and if based on ordinary standards of medical practice, during reasonable attempts to either maintain or restore spontaneous circulatory or respiratory function in the absence of aforesaid brain function, it appears that further attempts at resuscitation or supportive maintenance will not succeed, death will have occurred at the time when these conditions first coincide. Death is to be pronounced before artificial means of supporting respiratory and circulatory function are terminated and before any vital organ is removed for purposes of transplantation.

"These alternative definitions of death are to be utilized for all purposes in this state, including the trials of civil and criminal cases, any laws to the contrary notwithstanding." Kan. Stat. Ann. 77-202.

[7]61 A. B. A. J. 463, 464 (1975).

a dead brain that had been dead for some days." His conclusion, brought out on cross-examination, was that the discontinuance of supplemental oxygen to Baum was not a cause of death. Dr. Ritterhoff's unequivocal and uncontradicted testimony was sufficient to establish the necessary causal connection between appellant's criminal act and Baum's death. *Cf. State* v. *Cochrane* (1949), 151 Ohio St. 128, and *State* v. *Bynum* (1942), 69 Ohio App. 317.

To further support his argument on proximate cause, the defense argues that the shock Baum underwent while in surgery caused the cardiac arrest which in turn resulted in the fatal interruption of oxygen to the patient's brain. Even assuming that the problems encountered during the operation triggered brain death, appellant cannot escape the natural consequences of his criminal act merely because of foreseeable complications. One who has inflicted an injury upon another is criminally responsible for his death, despite the fact that different or more skillful medical treatment might have saved his life; or that death was immediately caused by a surgical operation rendered necessary by the condition of the injury. *State* v. *Lytle* (1975), 194 Neb. 353, 231 N. W. 2d 681; *People* v. *Paulson* (1967), 80 Ill. App. 2d 44, 225 N. E. 2d 424. The evidence, in any event, did not support appellant's theory on this point. Dr. Ritterhoff testified that he had no difficulty in separating the trauma that occurred from the initial head blows from the trauma which *may have* resulted from the surgery.

The weight and sufficiency of expert and opinion testimony is a matter for the jury. In homicide cases involving the effect of expert medical testimony as to the cause of death, the general principle is that the injury need not be proved to be the direct or sole cause of death, as long as it started a chain of causation which resulted in or substantially contributed to the death.

To sum up, we conclude that no act of Dr. Walus either in operating or in stopping the supplemental oxygen supply was, as a matter of law, an independent intervening cause so as to require the granting of appellant's motion to acquit. We further conclude that there was ample evidence of probative value to support the jury's conclusion that the acts of ap-

pellant were the proximate cause of Baum's death. Appellant's first two assignments are overruled.

Appellant's third assignment states that the trial court committed prejudicial error in sentencing him to the electric chair because the imposition of the death penalty under R. C. 2929.03 constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Principal reliance is placed on the Supreme Court's decision in *Furman* v. *Georgia* (1972), 408 U. S. 238, which, broadly construed, forbids the *arbitrary* imposition of capital punishment.

Appellant posits three considerations which arguably demonstrate the arbitrary application of the death penalty in his case: (1) the discretionary decision of the Juvenile Division in binding him over to the grand jury for trial as an adult; (2) the "whim" of the jurors in a separate trial in finding his brother, who was also charged with aggravated murder, guilty of the lesser included offense of involuntary manslaughter; and (3) the prosecutor's discretionary decision to charge a specification of aggravating circumstances pursuant to R. C. 2929.04(A) (7).

The identical issues raised by the first and third allegations above were considered and rejected by this Court in *State* v. *Bell,* unreported, No. C-75068, decided April 12, 1976. We are not disposed to disturb that holding today. See also *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, citing *Gregg* v. *Georgia* (1976), 428 U. S. 153. The argument questioning the verdict and sentence imposed in the separate case of appellant's brother concerns matters which are outside the record and, therefore, not subject to review on this appeal. We note in passing, however, that there is no constitutional requirement that separate judgments against co-conspirators, where otherwise regular, must be equal and exact. *State* v. *Jackson,* unreported, First Appellate District, No. C-75519, decided December 13, 1976; *State* v. *Durham,* unreported, First Appellate District, No. C-74595, decided September 29, 1975.

The last argument under appellant's third assignment challenges the constitutionality of the requirement in R. C. 2929.04 (B) that he prove certain mitigating circumstances in order to escape the death penalty. The same argument was

made in *State* v. *Lockett* (1977), 49 Ohio St. 2d 48. In paragraph 11 of the syllabus of that case, the Supreme Court held:

"The requirement in R. C. 2929.04 (B) that a defendant prove by a preponderance of the evidence circumstances mitigating the imposition of the death penalty at a mitigation hearing after guilt has been proven, does not impose an unconstitutional burden upon a defendant, rendering the Ohio statutory framework for imposition of capital punishment unconstitutional."

Appellant's third assignment of error is overruled. The judgment of the Court of Common Pleas of Hamilton County is affirmed.

*Judgment affirmed.*

SHANNON, P. J., BETTMAN and BLACK, JJ., concur.