STATE OF NEBRASKA, APPELLEE, v. KENNETH D. MEINTS, APPELLANT.

322 N.W.2d 809

Filed August 6, 1982. No. 81-828.

Douglas McArthur, for appellant.

Paul L. Douglas, Attorney General, and Lynne Rae Fritz, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

BOSLAUGH, J.

After a trial to a jury the defendant, Kenneth D. Meints, was convicted of motor vehicle homicide and sentenced to imprisonment for 18 months to 3 years.

The prosecution arose out of an automobile accident in which Jodi Southard, an 8-year-old child, was fatally injured. At the time of the accident the victim was a passenger in an automobile operated by her father. There was evidence from which the jury could find beyond a reasonable doubt that an automobile operated by the defendant struck the rear of the Southard automobile, forcing it across the centerline of the highway and causing a front-end collision between it and a pickup truck proceeding in the opposite direction. The jury could also find beyond a reasonable doubt that the defendant was under the influence of alcoholic liquor at the time of the accident.

The principal issue upon the appeal relates to the cause of death of the victim. The evidence is that the victim was in a comatose condition when she was removed from the Southard automobile immediately after the collision. She was taken to the Beatrice Community Hospital by ambulance and examined there by Dr. John W. Porter. Dr. Porter testified that the victim was suffering from severe respiratory distress, to the point that he was afraid she might die in the emergency room. Dr. Porter diagnosed her injury as a severe head injury and made arrangements to have her taken to Lincoln, Nebraska, at once.

The victim arrived at the Bryan Memorial Hospital in Lincoln shortly after midnight on July 5, 1981, and was examined by Dr. Louis J. Gogela, a neurosurgeon. Dr. Gogela found the victim was totally stuporous and totally unresponsive. He concluded that she had sustained a very serious injury to the brain stem. Because of the nature of the injury he requested Dr. George J. Wolcott, a specialist in neurology and pediatric neurology, to assist in the treatment of the victim.

Both Dr. Gogela and Dr. Wolcott testified at length concerning the procedures which they followed in examining the victim. Their examinations disclosed that the victim was in complete areflexia, without reflexes, and with fully dilated and fixed pupils. There was an absence of spontaneous movements or breathing, and no response to normally painful stimuli. An encephalogram test performed on July 6, 1981, showed there was no brain activity, and Dr. Wolcott concluded cerebral death had occurred.

Since the time that the victim had been placed in the ambulance at the scene of the accident in Beatrice, Nebraska, at approximately 10:30 p.m. on July 4, 1981, she had been receiving assistance to enable her to breathe. At the hospital in Lincoln she was placed on a respirator and a drug was administered to assist in maintaining her blood pressure. Dr. Wolcott testified that over a period of 30 hours she was removed from the respirator 5 or 6 times and that on each occasion she did not begin to breathe.

Dr. Gogela testified that in his experience no person with an injury such as that sustained by the victim has ever recovered. In his opinion, a person with such an injury who is maintained on a respirator will die within 48 to 72 hours despite all life support that can be provided.

Dr. Wolcott testified that he has never known of a

patient with the type of injury which the victim sustained who survived. If such a patient is continued on life support systems, death usually occurs within a matter of days from pneumonia, kidney failure, heart failure, or other complications.

On the afternoon of July 6, 1981, after consultation with the family, Dr. Wolcott pronounced Jodi Southard dead and removed her from the respirator. Her heart continued to beat for a short time after she had been removed from the respirator.

An autopsy was performed upon the body of the victim by Dr. Harlan L. Papenfuss. Dr. Papenfuss testified that his examination disclosed the victim "had an early acute pneumonia developing." He further testified that in his opinion, within reasonable medical certainty, the cause of death was damage to the brain stem consisting of the upper portion of the cervical cord and the medullary portion of the brain stem.

The trial court instructed the jury that the State was required to prove beyond a reasonable doubt that the defendant caused the death of Jodi Southard by operating his motor vehicle while under the influence of alcoholic liquor and that the unlawful operation of his motor vehicle was the proximate cause of her death. The instructions contained a definition of both proximate cause and efficient intervening cause.

Instruction No. 10 was as follows: "If you find beyond a reasonable doubt that defendant unlawfully operated a motor vehicle as defined in these Instructions, and such unlawful operation proximately caused injuries to Jodi Southard, which:

"1. Caused her brain to irreversibly cease functioning so that there was an unresponsiveness to normal painful stimuli, an absence of spontaneous movements or breathing, and an absence of reflexes, and

"2. Her breathing and heart beat could be main-

tained only by medical support systems which condition was also irreversible,

"Then the subsequent withdrawal of such support systems before her breathing and heart beat finally stopped would not be an efficient intervening cause of her death, and defendant's unlawful operation of a motor vehicle would be the proximate cause of such death."

Instruction No. 10, which was objected to by the defendant, defined "brain death" and advised the jury that if it found beyond a reasonable doubt that brain death had in fact occurred, then withdrawal of life support systems from the victim would not be an efficient intervening cause of her death. The defendant contends that instruction No. 10 was erroneous; that the trial court should have defined death in terms of cessation of respiration, heartbeat, and circulation; and that withdrawal of the life support systems from the victim was an efficient intervening cause and the proximate cause of her death. For the purpose of this opinion, we consider brain death only as it may be involved in homicide cases. See *Commonwealth v. Golston,* 373 Mass. 249, 366 N.E.2d 744 (1977).

In a homicide case the State is required to prove that an act of the defendant caused the death of the victim. *Reyes v. State,* 151 Neb. 636, 38 N.W.2d 539 (1949). The fact that some other agency combined with the act of the defendant to cause the death is not a defense unless the other agency is an efficient intervening cause.

In *State v. Harris,* 194 Neb. 74, 230 N.W.2d 203 (1975), the victim sustained a fractured hip during an attempted robbery. The victim later died as a result of the injury, treatment of the injury, and complications that developed during the treatment. We held that the act of the accused must be a proximate cause of death but need not be the direct, immediate cause. It is sufficient if the direct cause re-

sulted naturally from the act of the accused, as where the direct cause is a disease or infection resulting from the injury inflicted by the accused. It is not a defense that improper treatment on the part of physicians, nurses, or the victim may also have contributed thereto. But where death results solely from erroneous treatment by another, the one who inflicted the injury is not responsible for homicide.

There is no evidence of improper or erroneous treatment in this case. The uncontradicted evidence is that the injury to the brain stem was a fatal injury for which there could be no treatment and from which there could be no recovery. By the use of life support systems the victim could be made to continue to breathe for a matter of days, but the nature of the injury was such that this function would cease within a short time even if the life support systems were continued.

The concept of "brain death" developed, of necessity, as a result of advancements in medical science and techniques which permit the artificial maintenance of certain body functions by external means. As stated by the Supreme Court of New Jersey in *In Re Quinlan,* 70 N.J. 10, 26-28, 355 A.2d 647, 656 (1976): "The determination of the fact and time of death in past years of medical science was keyed to the action of the heart and blood circulation, in turn dependent upon pulmonary activity, and hence cessation of these functions spelled out the reality of death.

"Developments in medical technology have obfuscated the use of the traditional definition of death. Efforts have been made to define irreversible coma as a new criterion for death, such as by the 1968 report of the Ad Hoc Committee of the Harvard Medical School (the Committee comprising ten physicians, an historian, a lawyer and a theologian), which asserted that:

" 'From ancient times down to the recent past it

was clear that, when the respiration and heart stopped, the brain would die in a few minutes; so the obvious criterion of no heart beat as synonymous with death was sufficiently accurate. In those times the heart was considered to be the central organ of the body; it is not surprising that its failure marked the onset of death. This is no longer valid when modern resuscitative and supportive measures are used. These improved activities can now restore "life" as judged by the ancient standards of persistent respiration and continuing heart beat. This can be the case even when there is not the remotest possibility of an individual recovering consciousness following massive brain damage. ["A Definition of Irreversible Coma," 205 *J.A.M.A.* 337, 339 (1968)].'

"The Ad Hoc standards, carefully delineated, included absence of response to pain or other stimuli, pupilary reflexes, corneal, pharyngeal and other reflexes, blood pressure, spontaneous respiration, as well as 'flat' or isoelectric electroencephalograms and the like, with all tests repeated 'at least 24 hours later with no change.' In such circumstances, where all of such criteria have been met as showing 'brain death,' the Committee recommends with regard to the respirator:

" 'The patient's condition can be determined only by a physician. When the patient is hopelessly damaged as defined above, the family and all colleagues who have participated in major decisions concerning the patient, and all nurses involved, should be so informed. Death is to be declared and *then* the respirator turned off. The decision to do this and the responsibility for it are to be taken by the physician-in-charge, in consultation with one or more physicians who have been directly involved in the case. It is unsound and undesirable to force the family to make the decision. [205 *J.A.M.A., supra* at 338 (emphasis in original)].' "

In *In re Bowman,* 94 Wash. 2d 407, 617 P.2d 731

(1980), the Supreme Court of Washington noted that with the recent advancement of medical science, the traditional common-law "heart and lungs" definition is no longer adequate. The court stated: "Until recently, the definition of death was both medically and legally a relatively simple matter. When the heart stopped beating and the lungs stopped breathing, the individual was dead according to physicians and according to the law. The traditional definition did not include the criterion of lack of brain activity because no method existed for diagnosing brain death. Moreover, until recently, no mechanical means have been available to maintain heart and lung action; and respiration, heart action, and brain function are so closely related that without artificial support, the cessation of any one of them will bring the other two to a halt within a very few minutes. Wasmuth, *The Concept of Death,* 30 Ohio St. L.J. 32, 38 (1969). . . .

"With the recent advancement of medical science, the traditional common law 'heart and lungs' definition is no longer adequate. . . .

. . . .

". . . It is the law's determination that brain death is the legal equivalent of death because—under current medical science—the capacity for life is irretrievably lost when the entire brain, including the brain stem, has ceased functioning." *Id.* at 412-16, 617 P.2d at 734-36.

More than one-half of the states now recognize brain death as a definition of death. In a number of homicide cases proof of brain death has been held to satisfy the requirement of the victim's death as an element of the crime.

In *Commonwealth v. Golston,* 373 Mass. 249, 366 N.E.2d 744 (1977), in affirming a conviction for murder in the first degree, the Supreme Judicial Court of Massachusetts approved an instruction which stated as a matter of law that brain death satisfied

the element of the death of the victim. The court also noted that the references to respiration and pulsation in the traditional definition of death "must be taken to refer to spontaneous rather than artificially supported functions." *Id.* at 254, 366 N.W.2d at 748.

In *Swafford v. State,* ____ Ind. ____, 421 N.E.2d 596 (1981), a conviction for murder was affirmed. The Supreme Court of Indiana held that "for purposes of the law of homicide proof of the death of the victim may be established by proof of the irreversible cessation of the victim's total brain functions." *Id.* at ____, 421 N.E.2d at 602.

In *State v. Johnson,* 60 Ohio App. 2d 45, 395 N.E.2d 368 (1977), a conviction for aggravated murder was affirmed. The court said: "Historically, the concept of clinical death embraced by the medical and legal professions has not included any criteria relating to brain activity. Death was regarded as the irreversible cessation of all vital functions, primarily respiration, circulation and heart beat, and its occurrence was marked by an instant or moment in time. Advances in medicine during the past several decades have rendered suspect these traditional criteria of death. Today the medical profession almost universally regards death as a continuing process which progresses through several distinct steps. Modern medicine has made it possible for physicians not only to diagnose brain death but also, paradoxically, to keep a patient, who has no chance of ever again functioning as a rational being with a human spirit and soul, 'alive' through artificial means.

. . . .

". . . From the premise that one is not dead under Ohio law until 'clinically dead,' appellant concludes that Otto Baum was legally 'alive' on November 6, 1975, even though his brain was dead, and therefore the *cause* of death was Dr. Walus' removal of the supplemental oxygen supply. The obvious flaw in

this argument is that Baum did not reach the point where Dr. Walus stopped administering oxygen by accident. He reached it because of defendant's act. A result may have more than one 'cause.' On the evidence, the most that can be said is that a jury question was presented as to the cause of Baum's death. . . .

"Was there evidence from which the jury could conclude beyond a reasonable doubt that appellant did, in fact, cause the death of Otto Baum? The answer must be yes. Every lay witness who observed Baum shortly after the attack testified that he was critically injured even before he arrived at General Hospital. Once there, his condition deteriorated rapidly to the point where surgery was necessary if he were to have any chance for survival. Although the operation was successful in removing the immediate danger posed by the blood clot, it failed to reverse the gradual collapse of Baum's central nervous system caused by the injuries to his brain." *Id.* at 48-51, 395 N.E.2d at 371-73.

In *State v. Fierro,* 124 Ariz. 182, 603 P.2d 74 (1979), in affirming a conviction for first degree murder where the victim had suffered brain death as a result of gunshot wounds, the court noted: "[T]he removal of life support systems did not change nor alter the natural progression of the victim's physical condition from the gunshot wounds in the head to his resulting death." *Id.* at 185, 603 P.2d at 77.

In *State v. Johnson,* 56 Ohio St. 2d 35, 381 N.E.2d 637 (1978), a conviction for aggravated murder was affirmed. The court held the jury could find that the defendant had caused the victim's death where the victim suffered brain death as a result of severe head trauma and supplemental oxygen was discontinued after 4 days of testing.

The cases which have been cited all support a rule that proof of brain death is sufficient as proof of the victim's death in a homicide case, and removal of

life support systems is not an efficient intervening cause of death in such cases. We conclude that the defendant's assignments of error are without merit.

The defendant makes two other arguments which require mention. The defendant complains that instruction No. 10 did not require the jury to find that the fact of brain death had been established in accordance with "reasonable medical standards." There are several reasons why that contention is without merit in this case.

The definitions used in instruction No. 10 followed, in substance, the standards which are now generally accepted for use in determining whether brain death has occurred. As the Colorado Supreme Court stated in *Lovato v. Dist. Ct.,* 198 Colo. 419, 601 P.2d 1072 (1979), in referring to the 1968 report of the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death: "These criteria constitute the basis of accepted medical standards for determination of brain death." *Id.* at 426, 601 P.2d at 1076.

It appears from the record that there was no issue in the District Court concerning this matter. The objection to instruction No. 10 was on a different ground. The testimony of Dr. Gogela and Dr. Wolcott showed that they had followed accepted procedure in determining that brain death had occurred.

The defendant also calls attention to several legislative proposals. A bill was introduced in the Legislature in 1977 concerning the right of a terminally ill patient to direct that artificial life support systems be withheld. The bill, L.B. 400, was indefinitely postponed in committee. In 1982 a bill was introduced in the Legislature to adopt the Uniform Determination of Death Act. The bill, L.B. 691, was also indefinitely postponed in committee. We find nothing in regard to these matters which is controlling in this case.

There being no error, the judgment of the District Court is affirmed.

AFFIRMED.

CLINTON, J., concurring in the result.

I concur in the result. Most of the discussion about brain death is wholly unnecessary. The time of death of the victim is not an issue in this case. The proof was that the victim was dead by any standard when the charge was filed. The only issue other than defendant's criminal culpability was whether her death was caused by the act of the defendant or by withdrawal of the support system. The ordinary instruction on intervening cause would have sufficed. The undisputed testimony is that defendant's acts and not the withdrawal of the support system were the cause of death. The giving of instruction No. 10 was harmless error. The discussion in *State v. Harris,* 194 Neb. 74, 230 N.W.2d 203 (1975), and *State v. Johnson,* 60 Ohio App. 2d 45, 395 N.E.2d 368 (1977), cited in the court's opinion, adequately disposes of the defendant's arguments. There is no need, in cases of this type, to be concerned with the issue of brain death unless the State begins to prosecute for homicide while the victim is still on the life support system.

WHITE, J., joins in this concurrence.