**STATE of Minnesota, Plaintiff,**

v.

**Duane Dean OLSON, Jr., Defendant.**

**No. C8–88–1771.**

Supreme Court of Minnesota.

Jan. 31, 1989.

Phillip S. Resnick, Minneapolis, for defendant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Robert M.A. Johnson, Anoka County Atty., Robert D. Goodell, Asst. County Atty., Anoka, for plaintiff.

Victoria M. Lemburger, Minn. Hosp. Ass'n, Minneapolis, Robert Eelkema, Minn. Medical Ass'n, Minneapolis, amicus curiae.

SIMONETT, Justice.

The trial court asks us the following certified question:

> Whether brain death, defined as irreversible cessation of all functions of the entire brain, including the brain stem, as stated in the Uniform Determination of Death Act * * * constitutes "death" for purposes of Minn.Stat. § 609.20 and Minn.Stat. § 609.19 (1988).

Defendant Duane Olson is charged with second degree murder and first degree manslaughter in the death of his 6–week–old son, Dustin. On January 4, 1988, the police were called to the Olson home because Dustin was not breathing. The child was taken to the hospital, where, according to the complaint, the child "was diagnosed as being brain dead, but was placed upon life support systems which sustained his respiratory functions until January 8, 1988." The baby was diagnosed as having had an intracranial brain injury secondary to "whiplash shaken baby syndrome." The complaint further stated, "On January 8, 1988 at approximately 4:10 p.m., the hospital, after consulting with the family, disconnected the life support systems and the baby was declared dead at 5:25 p.m. on January 8, 1988." According to the complaint, defendant Olson told police that he had been awakened during the early morning hours of January 1, 1988, by the baby's crying; that he had shaken the baby three

times to stop the crying, each time harder than the last; and that during the shaking the baby's head moved back and forth unprotected. According to the police, defendant also told them of an earlier shaking incident. The autopsy disclosed cerebral swelling with bilateral subdural hemotomas.

At the pretrial hearing, defendant moved to dismiss the complaint on the grounds it did not establish probable cause that defendant committed the crimes charged; that instead the child's death was caused by removal of the life support system, not by defendant's actions. The state called as witnesses the two doctors who had attended the child, Dr. Ronald Spiegel, a board-certified pediatric neurologist, and Dr. John Ring, Medical Director of the Pediatric Intensive Care Unit at Children's Hospital in St. Paul. Dr. Ring is board certified in pediatrics with subspecialty fellowships in pediatric cardiology and pediatric internal care. Dr. Spiegel said the child was at, or near, the point of brain death when admitted to the hospital. The next day, January 5, the clinical examination demonstrated brain death. The baby had no response to any stimuli, no reflexes or movement, no brain activity on the EEG. The same tests were repeated on January 6, 7, and 8, with no change. The doctors concluded the child's entire brain was completely non-functional and that the brain damage was irreversible. On January 8, the cardiopulmonary support system was disconnected. While the parents were consulted, their permission was not sought nor obtained for the disconnection, the child then being considered dead.

The trial court denied defendant's motion to dismiss, but, at the request of the state, certified the issue of whether brain death was "death" as that term is used in our homicide statutes. We accepted accelerated review.

Before answering the certified question we need to decide whether it is necessary for us to answer and if it is appropriate for us to do so at this time. First, however, we must discuss the concept of brain death.

## I.

 Traditionally, death has been signified by cessation of breathing and heartbeat. When this occurs, inevitably there is a termination of all vital organ functioning and death is present. If the brain ceases to function, breathing and blood circulation cease too, and death occurs. In the last 30 years, however, medical technology has developed mechanical respirators and cardiac resuscitation methods that will produce breathing and heartbeat in the body even with the brain dead. In such a case, the body is completely unresponsive; there is no movement, no reflexes, no response to any stimulus. The muscles are flaccid, the pupils of the eyes fixed and dilated. There is no central nervous system activity. The body begins to decompose. The condition is irreversible. Even so, the mechanical support system will produce breathing and heartbeat in the body; the skin, for example, stays warm, urine is excreted, and glucose is metabolized. Despite the support system, however, cellular decomposition begins and, in a matter of weeks, all breathing and heartbeat stop.

The brain may be said to consist of two parts: the main cerebral hemispheres, which are the center of intelligence, cognition, emoting, consciousness, and the higher perceptions; and the brain stem, which is the lower middle part of the brain, connecting to the spinal cord and controlling respiration, blood pressure, and other biological functions. "Brain death," as that term is used in the medical community, means the entire brain, including the stem, is dead. This condition must be distinguished from a separate condition known as a persistent vegetative state, where the person is in an irreversible coma, but there is still at least some residual brain activity. (Karen Ann Quinlan was such a case.) A person in a persistent vegetative state is still living and is not dead under any definition of death. Removal of the support system from a patient in this vegetative state raises the question of when may life supports be removed from a dying person, see, e.g., In re Torres, 357 N.W.2d 332 (Minn.1984); removal of the life support

system from a brain-dead patient, on the other hand, is considered to be removal of the support system from a person already dead.

The medical profession has recognized the concept of brain death since at least 1968. *See A Definition of Irreversible Coma, Report of the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death,* 205 J.A.M.A. 337 (1968). Since then, other highly reputable organizations have affirmed the concept.[1] Forty states and the District of Columbia have enacted statutes recognizing brain death as death.[2] Seven states without brain death statutes have, by judicial decision, recognized brain death.[3]

If the concept of brain death as death is accepted, the next question—which is a separate question—is what are the criteria for determining that brain death has, in fact, occurred. Even under the traditional definition of death, it should be remembered, there is a need for procedures to determine that death, indeed, has taken place. The Harvard Report lists four criteria for brain death: unreceptivity and unresponsivity; no movement or breathing; no reflexes; and a flat EEG. In 1976 the Minnesota Medical Association adopted the following criteria: cerebral unresponsivity; no breathing for 3 minutes without a respirator; no brain stem reflexes; two separate clinical examinations with at least 12 hours between; irreversibility, specifically excluding the possibilities of hypothermia or intoxication; and, in appropriate cases, such confirmatory tests as a flat EEG or a cerebral angiography showing lack of blood flow to the brain. *See* Cranford, *Minnesota Medical Ass'n Criteria: Brain Death—Concept and Criteria,* 61 Minnesota Medicine 561–63 (1978).

If the law accepts that a brain-dead person is dead and that the criteria and procedures for determining that death are established, then, say health care professionals, there are good secondary reasons for legally declaring brain death to be death. Dr. Ring pointed out the duty of the medical profession is to treat the living; to maintain artificially an appearance of life in a dead body is an affront to human dignity and exacts a heavy emotional toll on the patient's family and the hospital nurses and staff. Both Dr. Ring and Dr. Spiegel also noted that organs in a brain dead body being maintained on a life support system begin deteriorating and soon are unusable for donation and transplantation. Finally, Dr. Ring mentioned it is inappropriate to devote scarce and expensive resources to body maintenance in a brain death situation.

The concept of brain death is firmly established in the medical community. Defendant does not dispute the medical evidence. The concept has been accepted by an impressive number of state legislatures. No court has denied the validity of the concept. Nevertheless, two considerations give us pause in undertaking to answer the certified question.

---

1. In 1975 the American Bar Association House of Delegates approved a Definition of Death Act. *See* 61 A.B.A.J. 463, 464 (1975). In 1978 the National Conference of Commissioners of Uniform State Laws adopted a Uniform Brain Death Act. In 1979, the American Medical Association approved a model determination of death statute.

 In 1980 the National Conference of Commissioners on Uniform State Laws approved the Uniform Determination of Death Act. *See* footnote 5, *infra.* This model act was subsequently adopted by the American Medical Association in 1980 and by the American Bar Association in 1981. Also, in 1981, the President's Commission for the Study of Ethical Problems in Medicine and BioMedical and Behavioral Research issued a report in which it defined death and recommended adoption of the Uniform Determination of Death Act in all jurisdictions.

2. Brief of amici curiae Minnesota Hospital Association and Minnesota Medical Association, Exhibit C.

3. *State v. Fierro,* 124 Ariz. 182, 603 P.2d 74 (1979); *In re Haymer,* 115 Ill.App.3d 349, 71 Ill.Dec. 252, 450 N.E.2d 940 (1st Dist.1983); *Swafford v. State,* 421 N.E.2d 596 (Ind.1981); *Commonwealth v. Golston,* 373 Mass. 249, 366 N.E.2d 744 (1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788 (1978); *State v. Meints,* 212 Neb. 410, 322 N.W.2d 809 (1982); *People v. Eulo,* 63 N.Y.2d 341, 482 N.Y.S.2d 436, 472 N.E.2d 286 (1984); *In re Welfare of Bowman,* 94 Wash.2d 407, 617 P.2d 731 (1980).

## II.

First of all, it is not clear that this case requires an answer.

To prove defendant guilty of the crimes charged, the state must prove the defendant's acts were a "substantial causal factor" in causing the child's death. *See State v. Sutherlin*, 396 N.W.2d 238, 240 (Minn.1986); *State v. Smith*, 264 Minn. 307, 318–22, 119 N.W.2d 838, 846–49 (1962). It must be shown that defendant's acts injured the child's brain which then led to the child's death. Dustin Olson is now dead by any definition. Continued use of the mechanical support system would not have prevented Dustin's death; it would only have postponed the cessation of breathing and heartbeat, the traditional determinants of death, for a short time. Placing the child on the respirator and then subsequently removing the machine was, a jury could find, in accordance with accepted medical practice. In other words, if death is defined as the cessation of breathing and heartbeat, a jury could still find that defendant's conduct caused the child's death. Indeed, the state conceded at oral argument that this case can be prosecuted without defining brain death as death.

However death is defined, the medical evidence produced at trial will be essentially the same; the doctors will still have to testify to their course of treatment. The state suggests that jurors may be confused by the evidence and choose to believe erroneously that the doctors removed the support system from a living person. Even if this were so, the jury could still find that defendant's conduct was a substantial contributing cause to the child's death. As the trial court properly ruled, the doctors' conduct was not, as a matter of law, a superseding intervening cause. The medical intervention was a normal, foreseeable consequence of defendant's shaking the child.

To be a superseding cause, the intervening conduct must be the sole cause of the end result and that is not the case here. Removal of the life support system did not produce a death that would not otherwise have occurred. *See generally, Minnesota Practice, JIG* 142 (3d ed. 1986) and cases cited; *Restatement (Second) of Torts* § 443. "In effect, the doctors were just passively stepping aside to let the natural course of events lead from brain death to common law death." *State v. Fierro*, 124 Ariz. 182, 186, 603 P.2d 74, 78 (1979). *See also Commonwealth v. Golston*, 373 Mass. 249, 366 N.E.2d 744 (1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788 (1978).

In other words, defendant's motion to dismiss could be, and was, properly denied without the need to define brain death as death. We hesitate to answer the certified question when it is unnecessary at this time to do so, when at best we are being asked at the pretrial stage to make an alternative holding, which in turn depends on how the trial court chooses to instruct the jury. This is not to say there is not a compelling need to clarify the legal status of brain death. A determination of when death occurs can be of critical importance in a wide variety of legal situations, such as family inheritance, the statute of limitations in civil cases, life insurance, and even eligibility for receipt of federal funds under Medicare, Medicaid, and Social Security. *See* Abram, *The Need for Uniform Law on the Determination of Death*, 27 N.Y.L. Sch.L.Rev. 1187, 1188–89 (1982). A determination of death also affects availability of transplantable organs under the Minnesota Anatomical Gift Act, Minn.Stat. §§ 525.921–.925 (1988). The only point we wish to make is that in this case, at this time, while clarification of brain death might be desirable, it is not necessary.[4]

---

**4.** At trial the jury will be asked to decide if defendant's acts caused Dustin Olson's death on January 8, 1988. There is no need to define the time of death on January 8 and hence no need to define death; the need, if there is one, is to explain causation.

If the jury were instructed that death occurred on January 8 prior to removal of the

respirator (brain death), the causation issue would perhaps be simplified. Nevertheless, causation can be adequately handled if the jury is instructed that the state must prove beyond a reasonable doubt that defendant's acts had a substantial part in bringing about the child's death. The jury can also be told it is not necessary that the defendant's acts be the sole cause

This leads to the next step in our analysis. Even though a resolution of the brain death issue is not essential, should this court nevertheless decide the question now?

### III.

Minnesota is a "code state," which means "the legislature has exclusive province to define by statute what acts shall constitute a crime * * *." *State v. Soto*, 378 N.W.2d 625, 627 (Minn.1985). In *Soto*, we felt constrained to construe the term "human being," left undefined in our vehicular homicide statute, in accordance with its common law meaning as a person "born alive" and hence excluding an unborn child. We noted that the common law definition was well settled and had been followed in 23 of 25 state jurisdictions that had considered the question. *Id.* at 628. In this case, defendant argues that here, too, we must construe the term "death" in our homicide statutes to follow the traditional common law definition of cessation of breathing and heartbeat.

*Soto*, however, was a quite different case. The common law, for criminal law purposes, had adopted a bright-line rule that causing the death of a person born alive was homicide, while causing the death of an unborn person was feticide, a separate crime. In this case we are not confronted with a well-understood common law bright-line rule. Instead, we are confronted with a legal definition of death rendered ambiguous by the remarkable advances of science over the past 30 years; and the common law, which constantly evolves with the changing needs of society, may appropriately reevaluate the traditional definition. Of the seven states that have judicially recognized a brain death definition of death, *see* footnote 3, all but one (Massachusetts) are code states like Minnesota.

Nevertheless, while construing the term "death" to include brain death would not offend common law evolutionary principles, this court believes it should decline the invitation to consider the question at this time.

Birth and death, marking our time on earth, are causes for wonderment. We come into this life, says Eric Fromm, without our consent and we leave it against our will. For people of faith, death is the time when the soul leaves the body. Death touches our deepest concerns about human existence, and when the law is asked to intrude on these concerns it should do so prudently, mindful of its limited competence. Sometimes however, as here, such practical matters as crime and contracts require the law to decide, for legal purposes, when death occurs.

In this instance, where the case before us does not require that we act, where the issue raised is of profound human interest, prudence dictates, we think, that the legislature should first be given an opportunity to consider the legal implications of brain death.[5] The legislature, with its broad based representation, its committee hearings, and its floor debates, presents the kind of public forum this issue deserves. The fact that 41 jurisdictions have enacted statutes on this subject suggests too, we

---

of death, so long as the defendant's acts start a chain of events which results in or substantially contributes to the death; and, further, that if this chain of causation is found to exist, it is not broken by any treatment or lack of treatment administered to the child by the doctors in this case.

*See State v. Johnson*, 60 Ohio App.2d 45, 395 N.E.2d 368 (1977), *aff'd*, 56 Ohio St.2d 35, 381 N.E.2d 637 (1978); *Cranmore v. State*, 85 Wis.2d 722, 271 N.W.2d 402 (Wis.Ct.App.1978); *State v. Holsclaw*, 42 N.C.App. 696, 257 S.E.2d 650 (1979). In each of these three cases, the court held it unnecessary to define brain death and analyzed the case in terms of causation. We leave, of course, the precise wording of the instructions to the trial judge who best will have the feel of this case when it is tried.

5. The certified question asks, in effect, whether the court should "enact" the Uniform Determination of Death Act, 12 U.L.A. 256 (1984), which includes both definitions of death and reads:

§ 1. [*Determination of Death.*] An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards.

think, that the legislative route is generally thought to be preferable. Moreover, it is not just a new definition of death that is needed but other related issues might be addressed as well, issues that lend themselves to the legislative process of education and deliberation. What should be the time of death for a brain dead person? When the first clinical examination confirms brain death, or later, when, after further confirmatory tests, the doctor makes a formal declaration of death? Should the determination of brain death be "in accordance with reasonable medical standards," as the Uniform Act states, or should the law specify further criteria or procedures?

To date, the legislature has not acted. A brain death bill was introduced in the 1977 legislative session and again in 1979, but not pursued. *See* Cranford, *supra.* In 1987, however, the legislature amended the Anatomical Gift Act to require hospitals to inform families of potential organ donors of the opportunities for transplantation and the procedures involved. *See* 1987 Minn. Laws, ch. 32, § 1, amending Minn.Stat. § 525.94. Review of the audiotape of a legislative hearing on the bill discloses the committee was apparently aware that a determination of death in brain death cases was necessary if the anatomical gift program was to work. *See* Hearings on House File No. 23 before House Committee on Health and Human Services, 1987 Minn. Legis., Feb. 19 (audiotapes).

This appeal demonstrates the urgent need for legislative action. We sympathize with conscientious and dedicated physicians and health care professionals confronted almost daily with legal uncertainty in what, for them, is accepted medical practice. We have noted, too, other important legal issues involving brain death which are certain at any time to surface. The legislature is now in session and we trust it shares our sense of urgency. For the reasons given, we decline at this time to answer the certified question. If the legislature does not promptly act, however, we may have to provide an answer the next time the question comes before us.

Question declined.

WAHL, Justice (dissenting).

The majority opinion clearly and cogently sets forth the issues presented in the question decided and certified to this court by the trial court and persuasively indicates the advisability of including brain death in the definition of death. I disagree only with the decision to decline to answer the question which is properly before us.

To date, the Minnesota legislature has twice been offered the opportunity to enact legislation defining brain death as death, and has twice declined to do so. The issue has now arisen as an issue in an actual case or controversy and is within the field of this court's competency. Under these circumstances, we should, in my view, answer the question.