## Peirson v. Duncan et al., Appellants.

*Charge of court—Inadequate presentation of case.*

It is error to confine the attention of the jury to one view of a case where there is more than one which they should consider. If no particular instructions be asked the court is responsible for the general effect only of the charge, and in considering the charge the whole of it must be taken together. If when so considered it has a tendency to mislead, though no particular portion of it be clearly erroneous, it is cause for reversal.

*Sale—Terms of payment—Previous dealings—Custom—Evidence.*

In case of a contract to deliver pelts, where no terms of payment have been agreed on, evidence of previous dealings between the parties and of the custom of the trade is admissible to fix the terms.

*Sale—Breach of contract—Payment—Deliveries.*

In case of a running contract to deliver pelts, failure to make payment, after failure to deliver, will not excuse failure to make subsequent deliveries.

162      187
21 SC ¹268

162      187
25 SC ¹506
162      187
29 SC ¹329
162      187
31 SC      8

Argued Jan. 3, 1894.   Appeal, No. 413, Jan. T., 1893, by de-
fendants, John P. Duncan and Daniel McElwee, trading as
Duncan & McElwee, from judgment of C. P. No. 1, Phila. Co.,
Dec. T., 1891, No. 1106, on verdict for plaintiff, John W. Peir-
son.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM,
MITCHELL, DEAN and FELL, JJ.   Reversed.

Assumpsit to recover damages for breach of contract to de-
liver pelts.   Before BIDDLE, J.

On the trial it appeared that for pelts delivered from Aug. 15,
to Sept. 4, 1891, plaintiff owed $940, which he paid on Oct. 5,
1891, and on Oct. 7th another lot of pelts was delivered.   Be-
tween Sept. 4th and Oct. 7th no pelts appear to have been de-
livered.

When plaintiff was on the stand, he was asked:

" Q. You have spoken of a trade understanding that there
was to be thirty days allowed for the payment.   What arrange-
ment or what understanding was there between you and Dun-
can & McElwee prior to July, 1891, as to the thousands of
dozens of hides you say you bought from them ? "   Objected
to, for the reason the plaintiff is seeking to recover under the
contract which he alleges was made in July, 1891.

The Court: I understand that.   But there was nothing said
about the terms of payment then.   Exception to defendant. [1]

The Witness: " I have always bought them on thirty days.
Thirty days was the usual trade time ; nothing less than thirty
days.   If you go into a New York house and buy a lot of pelts,
when you go out and say ' usual terms,' that means thirty days.
I had been dealing with Duncan & McElwee for years, and
they trusted me three months, may be four months.   They were
perfectly satisfied if I paid them in thirty days.   Now, if they
had wanted any different terms at the time this contract was
made and would have said so, I would have tried to meet the
case, or else I would have been a defaulter."

The court charged as follows :

" In this case the plaintiff contends that at a certain time he
was receiving certain pelts from his brother.   He was getting
all that his brother made ; but, inasmuch as his brother's were
unassorted, he was obliged to take a great many skins that
were of higher value than he wished ; that, in consequence of

that, he suggested to the defendants in this case that if they would take all the skins that he had been taking off his brother, and let him have this lower grade of skins and what other skins he wanted, it would be mutually advantageous to both parties ; that in consequence of that Mr. Duncan came to his office, where he had the agreement with his brother to sell to Mr. Duncan, and Mr. Duncan agreed to take all the skins that his brother made, at three dollars a dozen.    Mr. Peirson then said that he and Mr. Duncan then discussed what skins he was to get and the price he was to give for them, and that it was there agreed between them that the defendants were to furnish him one hundred and twenty dozens a week, and that the price paid for these was to be two dollars and fifty cents for one quality and three dollars and fifty cents for the higher quality ; that he was to be furnished with the lower class as far as they would go, and if they could not make up the one hundred and twenty dozens by furnishing the two dollars and fifty cents skins they were allowed to make up the number by the three dollars and fifty cents skins, so that the whole amount he should get of one or the other of those was to be one hundred and twenty dozens a week ; that in consequence of that for a certain length of time they went on and furnished him according to the contract.

" At a certain date, however, in the fall of 1891, they refused to supply him as they had been doing.    He then went into the market and endeavored to procure from other sources these skins at the same price.    He found, however, that that was impossible ; that the skins had been engaged ; that the season was past apparently when a man could make a contract for skins, and that he could not go into the market on that date and get any amount of them at all.    He was therefore obliged to give up making these skins in the way in which he had intended, and he therefore brings this suit before you for these damages ; and [he says that the damages to which he is entitled is the amount which he would have received if these defendants had furnished him these goods according to their contract ; and he has given his estimate and stated the details to you by which he claims that he would have made one dollar and fifty-nine cents a dozen if he had been furnished as was agreed.] [2]

" Now, the defendant in this case, Mr. Duncan, denies positively that any such arrangement was made at all. He does agree that he went to see Mr. John Peirson, and that at his office he signed this agreement with his brother, Charles Peirson, to take all those skins at three dollars ; but he testifies positively that he made no arrangement at all after that. He says : ' Well, I made no arrangement with Mr. Peirson at all. They were made with his brother, C. C. Peirson. I made a contract with him for six months to pay him three dollars a dozen and one dollar and fifty cents a dozen for the common stock. I did not make any arrangement with John Peirson at all. He came and told me that his brother's pelts were for sale. Of course, I made arrangements with C. C. Peirson, and I signed the contract in John W. Peirson's office. He never said a word to me about the price, or the number of dozens or anything of the sort, or the goods he was to receive. We furnished him the goods until he would not pay us any longer.'

" So that, as I say, Mr. Duncan denies positively that any such arrangement whatever took place ; and further takes the defence that, even if this agreement was made, as it is admitted there was nothing said by either party about the price at the time the arrangement was made, he would be entitled to cash. That would be true if you find that there was nothing which would modify that view.

" [Mr. Peirson alleges, however, that he had been dealing with this man for eight or ten years, and that this was the course of dealing between them, and therefore it was quite unnecessary that he should say anything about the terms of the payments ; and he also has brought Mr. Stern and another gentleman here, who swear that that was the custom of the trade —thirty days—that if you paid within thirty days that was satisfactory, and therefore that Mr. Peirson had complied in every respect with what was the real understanding in this case.] [3]

" It appears also that there is a bill which Mr. Peirson admits that he owed these parties. He refused to pay it at the time. He paid up to a certain date $940, more or less, and at that time he said he would not pay until he saw whether they made the next delivery on the 11th of September ; and they not having made that delivery, that then he refused to pay, and I sup-

pose, anticipating this defence, preferred, if he owed anything, that it should be deducted out of what he alleged they owed him, and he is therefore willing in this case, if you find that the plaintiff is entitled to damages, that you should deduct from the damages the amount which you think the defendant is entitled to—$145—and which he admits to be due."

Defendants' point was among others as follows:

"1. It being uncontradicted that, at the time of the payment of the $940, the plaintiff was then over thirty days in arrears for pelts, already delivered, the defendants were not obliged to further deliver pelts, and your verdict cannot be for the plaintiff." Refused. [4]

Verdict and judgment for plaintiff for $2,011.38.

*Errors assigned* were (1) ruling on evidence, quoting bill of exceptions and evidence; (2–4) above instructions, quoting them; (5) that the charge, " as a whole, failed to give the jury instructions as to their duty in the case, and left them in ignorance of the law applicable thereto ; " and (6) that the charge " wholly failed to give the jury any instructions as to the measure of damages."

*James M. Beck*, *William F. Harrity* with him, for appellant, cited : Iron Co. v. Diller, 17 W. N. 6 ; Canal Co. v. Harris, 101 Pa. 92; Bisbing v. Bank, 93 Pa. 79; R. R. v. Brandtmeyer, 113 Pa. 610.

*Alex. Simpson, Jr.*, for appellee, cited, on measure of damages : McHose v. Fulmer, 73 Pa. 365; Hoy v. Gronoble, 34 Pa. 9; Wolf v. Studebaker, 65 Pa. 460.

The utmost that can be said on the subject is that the trial judge might have been more explicit, even though not asked to be—an omission, simply, for which a reversal is never had : Garsed v. Turner, 71 Pa. 56.

OPINION BY MR. JUSTICE McCOLLUM, July 11, 1894 :

There was no dispute between the parties in regard to the quantity, quality or price of the pelts delivered, or in respect to the payments made on account of them.   But the plaintiff claimed that the defendants verbally promised to furnish him

one hundred and twenty dozen pelts each week from the 18th of July, 1891, to the first of January, 1892, and that in violation of their promise they refused to deliver pelts to him after September 4, 1891. He also claimed that in consequence of their refusal to deliver the pelts he sustained damage equal in amount to the profit he would have made if they had complied with their promise, and this profit he estimated at one dollar and fifty-nine cents a dozen. The defendants positively denied the existence of any such agreement between them and the plaintiff as was testified to by him, and they introduced evidence to show that, at the prices he paid for the pelts, it was not possible for him to make the profit upon them which he claimed as the measure of his damages for their default. While denying that they were bound to furnish pelts to the plaintiff in accordance with his claim, the defendants admitted that, from the 18th of July to the 4th of September inclusive, they sold to him seven hundred and nine dozens of them; and they averred that they ceased to sell them to him solely because of his inability or unwillingness to pay for them on delivery. To this averment the plaintiff replied that he was not bound to pay for the pelts when they were delivered, but that, under a previous course of dealing between the parties and a custom of the trade, he was entitled to thirty days within which to pay for them after their delivery to him. It will be observed from this statement of the claims of the litigants that there were several issues of fact to be decided by the jury upon the evidence. Was there a contract between the parties, and if so what were its terms? Was the plaintiff to pay for the pelts on delivery or thirty days thereafter? Was the evidence in relation to prior dealings between the parties and a usage of the trade sufficient to overcome the presumption that the pelts were to be paid for when delivered? Assuming that the defendants were bound to furnish pelts to the plaintiff in accordance with his claim, what damages, if any, did he sustain in consequence of their refusal to do so? These were questions naturally arising from the evidence and to which the attention of the jury should have been directed in appropriate instructions. But the learned trial judge submitted the case without any reference to the legal principles applicable to it, and upon an inadequate and misleading statement of the claims of the con-

tending parties.  He told the jury what the plaintiff claimed in regard to a contract with the defendants for the sale and delivery of pelts, and that the defendants denied having made any such contract with him.  He also told them what the plaintiff claimed in respect to the damages sustained by the breach of the contract, but he did not refer to the testimony submitted by the defendants in answer to the claim for damages, nor furnish the jury any rule or standard by which the damages were to be measured.  The omission of instructions in relation to damages left the jury without any guide whatever in the ascertainment of them, and in this particular the charge was clearly inadequate.  In its statement of the claims made by the parties it was misleading because, while the plaintiff's claims were fully presented in it, the claims of the defendants were not so presented.  The plaintiff's claim in relation to damages rested solely upon his own oath, while the defendants' answer was supported by the testimony of three disinterested and intelligent witnesses, and yet the learned judge brought the former to the attention of the jury and did not even allude to the latter.  These witnesses were familiar with all the known processes or methods of tanning and were engaged in the same business as the plaintiff.  They testified that in 1891 there was no profit in tanning pelts at the prices the plaintiff paid for them.  This testimony, if brought to the attention of the jury and credited by them, would have defeated the plaintiff or reduced the verdict in his favor to a nominal sum.  The plaintiff's only answer to it was that he was the possessor of a tanning process of his own discovery which was known only to himself " and to a man that he could trust," and that by means of it he was able to make a profit in tanning pelts while other parties were losing money in the business.  He did not call the " man that he could trust " to corroborate him in this statement.

In Penna. Land Co. v. Harris, 101 Pa. 80, Mr. Justice MER-CUR, speaking for this Court, said : " It is error to confine the attention of the jury to one view of the case where there is more than one which they should consider: Garret v. Gonter, 42 Pa. 143 ; Relf v. Rapp, 3 W. & S. 21.   If no particular instructions be asked, the court is responsible for the general effect only of the charge ; and, in considering the charge, the

whole of it must be taken together. If, when so considered, it has a tendency to mislead, though no particular portion of it be clearly erroneous, it is cause for reversal: Washington Mutual Fire Insurance Co. v. Rosenberger, 3 W. N. 16." See also the opinion of our brother GREEN in Penn Iron Co. v. Diller, 17 W. N. 6. In accordance with the principles stated in the cases cited, we sustain the 5th and 6th specifications of error. We are not convinced that there was any error committed in the refusal of the defendant's first point or in the ruling complained of in the 1st specification; nor are we satisfied that the excerpts from the charge which are complained of in the 2d and 3d specifications constitute reversible error.

Judgment reversed and venire facias de novo awarded.