Commonwealth *v.* Milligan, Appellant.

608

Argued September 29, 1952. Before Rhodes, P. J., Hirt, Reno, Dithrich, Ross, Arnold and Gunther, JJ.

*Frederick B. Smillie,* with him *Paul A. Davis, 4th, Margaret Corson Applegarth* and *Smillie, Bean and Scirica,* for appellant.

*C. Howard Harry,* Assistant District Attorney, with him *J. Stroud Weber,* District Attorney, *Nicholas H. Larzelere,* Assistant District Attorney, and *D. C. Hauph,* Assistant District Attorney, for appellee.

Opinion by Dithrich, J., January 20, 1953:

In what gives every indication of having been a bitterly contested trial, replete with trial errors and

highlighted by overzealousness on the part of the prosecution, the defendant was found guilty of operating a motor vehicle while under the influence of intoxicating liquor. From a sentence of a fine of $200 and imprisonment for a period of six months, defendant has brought this appeal.

This is the second time he was brought to trial for the same offense. On the first trial a juror was withdrawn and the case continued because of prejudicial misconduct on the part of the Commonwealth. On the second trial the Commonwealth appears to have been determined that the defendant should not again get off so easily. Such determination evidently created the atmosphere in which the case was tried, culminating in the perhaps inadvertent, but heretofore unheard of, charge of the court that the jurors, if convinced beyond a reasonable doubt of the guilt of the defendant, *"should have no hesitancy whatsoever, as jurors in the grand, old American system, of bringing in a verdict of guilty."* (Emphasis added.)

No explanation was given by the learned trial judge in his opinion refusing a new trial as to what he meant by the instruction, and, in the absence of any explanation, speculation as to what was meant would only lead into the realm of conjecture. Suffice it that if he was referring to the "American system" of justice, then the jury should have been instructed that a verdict of not guilty would be just as consistent with that system, if not more so. The overemphasis placed on *"bringing in a verdict of guilty"* could only be counterbalanced by a similar instruction as to bringing in a verdict of *not* guilty. (Emphasis added.)

"It is a primary duty of the trial judge—a duty that must never be ignored—in charging a jury to clarify the issues so that the jury may comprehend the questions they are to decide": *Sears v. Birbeck,* 321

Pa. 375, 383, 184 A. 6. In *Commonwealth v. Malone,*
354 Pa. 180, 47 A. 2d 445, after quoting the foregoing,
the Court added (p. 187) : "When the issues in either
a criminal or a civil case are not clarified in the judge's
charge, the charge is of very little value in the adminis-
tration of justice though it may contain no prejudicial
error."

We have already referred to the granting of a mis-
trial in the former trial of this case because of mis-
conduct on the part of the Commonwealth. That con-
sisted in the placing by a county detective at the elbow
of the assistant district attorney, in plain view of the
jury while the defendant was being examined in chief,
of a docket labeled in large black letters "Criminal
Docket." The obvious purpose was to direct the at-
tention of the jury to the fact that defendant had a
criminal record—he had been convicted once before on
the same charge. The learned trial judge, notwith-
standing his knowledge of that fact since he had pre-
sided at the former trial, said to defendant's counsel,
while Mrs. Frances Sargeant, the defendant's hostess
at dinner the evening preceding the alleged offense
and the first witness called by him, was on the stand :
"I was wondering . . . if you were going to use this
witness as a character witness?" When counsel, taken
by surprise, said "Sir?" the judge repeated, "Were you
going to use this witness as a character witness?" The
court's explanation is, "I was just trying to save time.
I thought, maybe, you neglected to ask her . . ." Giving
full faith to the explanation, the fact remains that
there was brought upon the record at the very begin-
ning of defendant's case a question that would not
have been raised in an orderly trial of the case. Per-
haps no great harm would have resulted if that had
been the end of the matter, but the court later charged
the jury that it "need not decide whether this defend-

ant here is a criminal" and immediately followed that up by saying, "Well, he is, or is not, a criminal." The jury might readily, and probably did, infer from that remark that the defendant had a criminal record and that that was why his reputation was not placed in evidence after the court had rather pointedly asked if it were not going to be. There is merit to defendant's contention that "putting the floodlight of judicial inquiry on the one issue in the case which could not be answered by the defendant, had the double effect of making the jury think it was of paramount importance and that the defendant must be of bad character."

Another objectionable issue was injected into the case by the assistant district attorney's asking defendant if a certain member of the Montgomery County Bar, then in bad repute, had not "also [been] associated with this case for a while." The question was put for the ostensible purpose of "check[ing] his credibility" as "We have a right to do . . . to ask who he talked to." The question was clearly irrelevant for the purpose stated and the court properly sustained an objection but refused defendant's motion to withdraw a juror and continue the case. We cannot go so far as to say that the court abused its discretion in refusing the motion; but since the court says in its opinion "It is not shown how this question would be prejudicial" and since the case must be retried again, we, rather than to prolong this opinion, refer the learned court below to the reasons set forth on pages 30 and 31 of appellant's brief.

Reverting again to the charge of the court, the jury was told, "You may say they [the witnesses] are all *interested,* I don't know, that is up to you to determine." (Emphasis added.) This instruction without

any statement as to what constituted interest on the part of a witness was clearly inadequate and, to say the least, misleading. From it the jury could infer that all the defense witnesses were as "interested" in the outcome of the case as the defendant and his wife. "A trial judge's charges which are inadequate or not clear, or which tend to mislead, are well recognized grounds for reversal: Reber v. Schitler, 141 Pa. 640, 21 A. 736; Peirson v. Duncan, 162 Pa. 187, 29 A. 733; Pa. Canal Co. v. Harris, 101 Pa. 80; Relf v. Rapp, 3 W. & S. 21; Stukey v. Rissinger, 31 Pa. Superior Ct. 3": *Sears v. Birbeck,* supra, 321 Pa. 375, 391, 184 A. 6. Continuing, the court below said, "so far as veracity of the witnesses is concerned, it may be that you could believe practically all of the testimony" and still find the defendant guilty on his admission "that he had a highball and a half" during the course of a long evening.

Upon a review of the testimony we are far from persuaded that the jury "could believe practically all of the testimony" and still find defendant guilty. Much of the testimony was in conflict, especially as to what caused defendant's car to "weave" from side to side of the road along which it was being operated and which according to the police first drew their attention to it. The prosecution claimed it was due to defendant's condition; he said it was due to a defect in the steering apparatus, which he had corrected at the first opportunity. The mechanic who made the repairs was under subpoena to appear in court; but since he had told counsel he had to go to the hospital a bench warrant was not asked for to compel his appearance. The repair bill was offered in evidence; it was objected to and the objection sustained, the court saying, "You know you cannot admit a doctor's statement." We fail to see the analogy between

an itemized mechanic's bill for repairs and a doctor's statement.

The defendant had served as a patrol judge at the spring race meet of the Whitemarsh Valley Hunt Club the afternoon of May 6, 1951. He had been in the saddle from about 2 o'clock until 5:30 and on the ride back to the stable his horse became fractious, causing defendant to bump his head sharply against a low-hanging branch of a tree. He said that to add to his discomfort a set of spurs which he had been breaking in that afternoon bit into his ankles and interfered with his walking at his usual gait. He had been host to a few guests at the Hunt Club following the meet but had not felt like drinking and, in fact, did not drink anything until after dinner at the Sargeants. Later in the evening, he and his wife went with the Sargeants to the Wings Field Club, where he was served another highball, which he "nursed" until ready to leave the club after he had consumed about half of it. He was looking for a place to get something to eat when he pulled into the parking place of the Fort Washington Hotel, after driving approximately two miles from the Wings Club, where he was placed under arrest and taken before a physician for examination. He was then taken to the borough lockup and placed in a cell, where he remained until 10 o'clock Sunday morning, when he was given a hearing before a justice of the peace. His wife was permitted to drive home but she was not permitted to take her husband with her.

In quoting the testimony in his charge the court told the jury the arresting officer had said he detected a "heavy" odor of alcohol on defendant's breath. The officer had not used the word "heavy". Slight inaccuracies in the quoting of testimony are excusable; but the court, having drawn a contrast between the man

who "may be under the influence" after consuming the allegorical "thimbleful" and the man who could drink a pint and not be under the influence, one causing an "odor", as testified to by the officer, and the other a "heavy odor", as inaccurately quoted by the court, may have created an erroneous impression in the minds of the jurors.

After the court had set up the dubious, if not false, standard of a thimbleful being sufficient to cause intoxication, the jury could readily infer that one and one-half highballs could easily put defendant under the influence—contrary to the common experience of mankind, of which the court may take judicial notice, that the average moderate drinker may consume two drinks without becoming under the influence—thereby lessening the Commonwealth's "most difficult time of proving how much a man has had" and to that extent easing its burden of proof. The foregoing instruction was immediately followed by this: "So, members of the jury, in general it seems to me that is the law, and in general, very general, being abstract, that is the general facts that pertain, without going into the testimony of individual witnesses." The law to be applied to the facts should be stated in clear and unequivocal terms. It does not suffice for a trial judge to say "in general it seems to me that is the law." The question being was the defendant under the influence of liquor at the time he was operating a motor vehicle, the jury should have been left free to decide the question on all the evidence without being told "if you care to" you may find the defendant guilty on his own testimony and that of his witnesses as to the quantity of liquor he had to drink.

The judgment is reversed and a venire facias de novo is awarded.