*In re* ALEX B. HAYMER—(Loyola University of Chicago, Appellee, *v.* Albert Haymer *et al.*, Appellants).

First District (3rd Division)   No. 82—2626

Opinion filed June 8, 1983.

Richard M. Daley, State's Attorney, of Chicago (Jane Clark Casey, Assistant State's Attorney, of counsel), for the People.

Morris A. Haft, of Chicago, for other appellants.

William H. Oswald and Leon S. Conlon, both of Chicago, for appellee.

Thomas S. Chuhak, of Chicago, guardian *ad litem.*

JUSTICE RIZZI delivered the opinion of the court:

On October 28, 1982, Loyola University of Chicago, which owns and operates Foster G. McGaw Hospital in Cook County, Illinois,

sought a declaratory judgment that its patient, seven-month-old Alex B. Haymer, was legally dead, thereby permitting the hospital to remove Alex B. Haymer from a mechanical ventilation system. The child's parents opposed the removal of the mechanical device, as did the child's guardian *ad litem.* Following an expedited hearing, the trial court entered an order on November 4, 1982, which provided that the legal death of Alex B. Haymer occurred on October 23, 1982, the date when doctors determined that the child had suffered the total and irreversible cessation of all functions of the entire brain. The order also authorized Foster G. McGaw Hospital, Loyola University Medical Center, to discontinue the mechanical ventilation system connected to the body of Alex B. Haymer. The trial court stayed the force and effect of its order for seven days to give the parties an opportunity to have appellate review of the order before the mechanical ventilation system was removed. The State of Illinois was permitted to intervene on the ground that it had an interest in the investigation and prosecution of any deaths which may have been caused by any criminal action in Cook County. The State objected to the stay on the basis that the circumstances surrounding the alleged legal death of Alex B. Haymer were suspicious, and that the medical examiner of Cook County must perform an autopsy as soon as possible because, according to the affidavit of the medical examiner of Cook County, "where brain death has occurred and the subject is maintained on artificial breathing and circulatory apparatus, tissue deterioration and destabilization occurs which may render it impossible to determine the cause of death ***." The guardian *ad litem* appealed the order of the trial court and moved for an emergency stay. We stayed the force and effect of the trial court's order and set the case for oral argument on December 6, 1982. In the meantime, on November 28, 1982, Alex B. Haymer's heart stopped functioning and the mechanical ventilation system was disconnected. Oral argument on the merits of the case was heard on February 16, 1983.

On appeal the parties contest whether Alex B. Haymer was legally dead on October 23, 1982, when it was medically determined that he had sustained total brain death, or on November 28, 1982, when his heart stopped functioning. We affirm the trial court's order that Alex B. Haymer was legally dead on October 23, 1982.

This case presents the issue of determining when death legally occurs in Illinois. Plainly, with the scientific and medical advances of recent years, the general and traditional definition of death, cessation of heartbeat, is no longer meaningful or factually accurate. In our present-day society, many people continue to live after experiencing

cardiac arrest, and cardiopulmonary by-pass machines permit a patient's heartbeat to cease for several hours with full clinical recovery after resuscitation. (See F. Plum & J. Posner, The Diagnosis of Stupor and Coma 313, 331 (3d ed. 1980); Jacobson, Anderson & Speigel, *Towards a Statutory Definition of Death in Illinois,* 14 J. Mar. L. Rev. 701, 709 (1981).) There has also been at least one instance where a permanent artificial heart has sustained a human's life for a relatively extended period of time. See Time, April 4, 1983, at 62.

In addition, the general common law definition of death, cessation of respiration and circulation,[1] is no longer acceptable by today's standards. (See Jacobson, Anderson & Speigel, *Towards a Statutory Definition of Death in Illinois,* 14 J. Mar. L. Rev. 701, 701-13 (1981).) To illustrate, in Sweet, *Brain Death,* 299 New Eng. J. Med. 410-11 (1978), the author, a neurosurgeon, states: "Indeed, it is clear that a person is not dead *unless* his brain is dead. The time-honored criteria of stoppage of the heartbeat and circulation are indicative of death only when they persist long enough for the brain to die." (See generally A. Guyton, Textbook of Medical Physiology 342 (6th ed. 1981).) Moreover, Illinois has enacted the Uniform Anatomical Gift Act which states: " 'Death' means for the purposes of the Act, the irreversible cessation of total brain function, according to usual and customary standards of medical practice." (Ill. Rev. Stat. 1981, ch. 110½, par. 302(b).) This definition of death, which is limited to the particular statute, is significantly different from the general common law definition of death.

In order to bridge the gap between the past and present-day meanings of death, 29 States have enacted statutes which have a definition of death for general application in their respective States. These statutes fall into three categories: (1) total brain death;[2] (2) total brain death or cardiopulmonary death;[3] and (3) total brain death only if artificial means of support prevent determination of death by traditional means.[4] What all these statutes have in common is their recognition that total brain death[5] is the death of the person.

---

[1]See Black's Law Dictionary 488 (4th ed. 1968). But see Black's Law Dictionary 360 (5th ed. 1979).

[2]Arkansas, Montana, Nevada, North Carolina, Oklahoma, West Virginia and Wyoming.

[3]California, Colorado, Georgia, Idaho, Kansas, Maryland, Mississippi, New Mexico, Ohio, Oregon, Tennessee, Vermont, Virginia and Wisconsin.

[4]Alabama, Alaska, Florida, Hawaii, Iowa, Louisiana, Michigan and Texas.

[5]There is general agreement that total brain death has occurred when there is no discernible evidence of either cerebral hemispheral function or function of the vital

Other States have judicially recognized that a person found to have total brain death is legally dead.[6] Thus, at least 34 States have now either legislatively or judicially recognized this precept.[7] Moreover, no case has been found in which total brain death has been rejected as being the death of the person where the issue has been specifically raised. On this point, in A. Moraczewski & J. Showalter, Determination of Death 30 (1982), the authors state: "That courts might not accept [total] brain death [as the death of the person] is of course theoretically possible. But the fact is that *no court has ever rejected it*, and given its overwhelming acceptance, none is likely to do so." Also, it has been stated: "Legally, medically and morally, this country now generally accepts the concept of brain death (although state laws defining death are still not completely uniform). Life support systems are routinely turned off when brain activity has irreparably ceased, even though heartbeat and breathing can be sustained artificially." *Who Lives, Who Dies? Making Life's final decision*, Chicago Tribune, May 24, 1983, sec. 1, at 18, col. 1.

In the present case, the guardian *ad litem* contends that if total brain death is to be considered the death of the person in Illinois, the change in the law should be made by the legislature. This contention

---

centers of the brain stem for an extended period, and when it is unequivocally evident that the abnormality of brain function is the result of structural or known metabolic disease and not the result of either depressant drug (or alcohol) poisoning or hypothermia. (F. Plum & J. Posner, The Diagnosis of Stupor and Coma 315 (3d ed. 1980).) Total brain death has also been described as where "the entire brain *** is irreversibly destroyed as the body's integrating center." (A. Moraczewski & J. Showalter, Determination of Death 11 (1982).) In the Report of the Medical Consultants on the Diagnosis of Death to the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, 246 J.A.M.A. 2184, 2184 (1981), it is stated: "[C]irculation and respiration can be maintained by means of a mechanical respirator and other medical interventions, despite a loss of all brain functions. In these circumstances, we recognize as dead an individual whose loss of brain functions is complete and irreversible."

[6]*State v. Fierro* (1979), 124 Ariz. 182, 603 P.2d 74; *Swafford v. State* (Ind. 1981), 421 N.E.2d 596; *Commonwealth v. Golston* (1977), 373 Mass. 249, 366 N.E.2d 744; *State v. Meints* (1982), 212 Neb. 410, 322 N.W.2d 809; *New York City Health & Hospitals Corp. v. Sulsona* (1975), 81 Misc. 2d 1002, 367 N.Y.S.2d 686. In Colorado, the total brain death concept of death was adopted legislatively (Colo. Rev. Stat. sec. 12—36—136 (Cum. Supp. 1982)), after it was recognized judicially (*Lovato v. District Court* (Colo. 1979), 601 P.2d 1072). See also Determination of Death 26-27.

[7]See notes 2, 3, 4, & 6. Connecticut and Illinois are not included here because their recognition of total brain death as the death of the person is presently limited to the purposes stated under our respective anatomical gift acts. Ill. Rev. Stat. 1981, ch. 110½, par. 302(b); Conn. Gen. Stat. 19a—270 (Supp. 1983).

was addressed in *In re Welfare of Bowman* (1980), 94 Wash. 2d 407, 617 P.2d 731, one of the leading cases in which total brain death was judicially recognized as the death of the person. There, the court stated:

"As was the case in Colorado and Massachusetts [where brain death was judicially recognized], no statute in this state has been enacted to define what constitutes death as posed by the facts now before us. It is both appropriate and proper, therefore, that this court decide that question." (94 Wash. 2d 407, 420, 617 P.2d 731, 738.)

Moreover, as the court stated in *Lovato v. District Court* (Colo. 1979), 601 P.2d 1072, in holding that a person is legally dead if he has sustained irreversible cessation of all functioning of the total brain:

"We recognize the authority of, and indeed encourage, the General Assembly to pronounce statutorily the standards by which death is to be determined in Colorado. We do not, however, believe that in the absence of legislative action we are precluded from facing and resolving the legal issue of whether irretrievable loss of brain function can be used as a means of detecting the condition of death. Under the circumstances of this case we are not only entitled to resolve the question, but have a duty to do so. To act otherwise would be to close our eyes to the scientific and medical advances made world wide in the past two or three decades." 601 P.2d 1072, 1081.

■ As in *Bowman* and *Lovato*, no statute in our State defines what constitutes death as posed by the facts now before us. Our supreme court has held that the proper relationship between the legislature and the judiciary is one of cooperation and assistance in examining and changing the common law to conform with the ever-changing demands of the community. (*Alvis v. Ribar* (1981), 85 Ill. 2d 1, 23, 421 N.E.2d 886, 896.) When there is a gap in the common law that manifestly should be bridged and the legislature has failed to take remedial action, it is the imperative duty of the judiciary to reform the law to be responsive to the demands of society. (*Alvis v. Ribar* (1981), 85 Ill. 2d 1, 23-24, 421 N.E.2d 886, 896.) For these reasons, we believe that it is both appropriate and proper that we decide the issue that is presented in this case. See *In re Welfare of Bowman* (1980), 94 Wash. 407, 420, 617 P.2d 731, 738; *Lovato v. District Court* (Colo. 1979), 601 P.2d 1072, 1081; *State v. Fierro* (1979), 124 Ariz. 182, 185, 603 P.2d 74, 77.

In resolving the issue, we recognize the nearly unanimous consensus of the medical community that when the whole brain no longer

354

functions, the person is dead.[8] (See A. Moraczewski & J. Showalter, Determination of Death 23 (1982).) In addition, we take into account that the prevailing practice of the medical community nationwide is to regard total brain death as the death of the person.[9] See *In re Welfare of Bowman* (1980), 94 Wash. 2d 407, 420, 617 P.2d 731, 733. We also recognize and take into account that the Illinois General Assembly has stated, for purposes of the Uniform Anatomical Gift Act, that death means the irreversible cessation of total brain function, according to usual and customary standards of medical practice. (Ill. Rev. Stat. 1981, ch. 110½, par. 302(b).) In this regard, we find it significant that the legislature's definition of death under the Uniform Anatomical Gift Act conforms to the consensus of the medical community that total brain death is the death of the person, and that adoption of that definition of death in the present case will conform the legal definition of death in Illinois to current medical standards.

---

[8]Total brain death is distinguishable from irreversible coma (persistent vegetative state). Irreversible coma is not recognized by the medical community as synonymous with death because the brain is functioning. The term "brain death" is used to identify the total absence of brain functioning. (See *An Appraisal of the Criteria of Cerebral Death—A Summary Statement*, 237 J.A.M.A. 982 (1977); *Lovato v. District Court* (Colo. 1979), 601 P.2d 1072, 1076 n.6.) Where there is total brain death, the brain has no potential for recovery. (F. Plum & J. Posner, The Diagnosis of Stupor and Coma 313 (3d ed. 1980).) Here, we note the basic distinction between the cerebral cortex and the brain stem. The cerebral cortex is the site of the highest centers of human intelligence, those concerned with the higher perceptions, and with the processes of thinking, emoting and consciousness. It may well be that lack of oxygen flow to the brain for a short period will result in total and irreversible cessation of the cortical brain functions. However, loss of oxygenated blood flow for such a period may not have a terminal effect upon the brain stem or lower brain. It is this portion of the brain which controls respiration, heart rate, blood pressure and other purely biological functions. Thus, a patient may well be rendered unconscious and incapable of recovering consciousness and any capacity for thought, emotion, and intellectual perception, but may have the ability to breathe spontaneously and maintain pulse and circulation. In such a situation, the person has not sustained total brain death (D. Meyers, Medico-Legal Implications of Death and Dying 12, 25-27 (1981)), and thus would not have "irreversible cessation of total brain function according to usual and customary standards of medical practice" (Ill. Rev. Stat. 1981, ch. 110½, par. 302(b)). See 237 J.A.M.A. 982; D. Meyers, Medico-Legal Implications of Death and Dying 27, 57-58 (1981).

[9]Several committees and reviewers have sought to establish appropriate criteria for determining brain death. The most widely known committee is the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death. Its criteria, as well as slightly different criteria emanating from other groups, are outlined and discussed in F. Plum & J. Posner, The Diagnosis of Stupor and Coma 314-19 (3d ed. 1980). In general, the characteristics of brain death as stated by the Ad Hoc Committee include: (1) unreceptivity and unresponsivity to intensely painful stim-

■ Accordingly, we conclude that a person who has sustained irreversible cessation of total brain function, according to usual and customary standards of medical practice, is legally dead. However, we recognize that in most instances when a person has sustained irreversible cessation of circulatory and respiratory functions according to usual and customary standards of medical practice, both the medical profession and our society accept that the person is dead without the need to assess brain functions directly.[10] We see no need to change or interfere with this practice judicially. We therefore hold that a person is legally dead if he or she has sustained either (1) irreversible cessation of total brain function, according to usual and customary standards of medical practice, or (2) irreversible cessation of circulatory and respiratory functions according to usual and customary standards of medical practice.[11]

uli; (2) no spontaneous movement or breathing for at least one hour; (3) no blinking, no swallowing, and fixed and dilated pupils; (4) flat EEG's taken twice with at least a 24-hour intervening period; and (5) absence of drug intoxication or hypothermia. (See *Report of the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death: A Definition of Irreversible Coma*, 205 J.A.M.A. 337 (1968); F. Plum & J. Posner, The Diagnosis of Stupor and Coma, 314-19 (3d ed. 1980); *Lovato v. District Court* (Colo. 1979), 601 P.2d 1072, 1076-77.) A number of States have adopted this so-called "Harvard" definition of brain death, either by statute or by court decision. (See Black's Law Dictionary 170 (5th ed. 1979).) However, the tests used for determining cessation of brain function have changed and will continue to do so with the advent of new research and technologies. The "Harvard criteria" are widely accepted, but advances in recent years have led to the proposal of other criteria. Report to the President's Commission, 246 J.A.M.A. 2184 (1981). See generally D. Meyers, Medico-Legal Implications of Death and Dying 28-42, 57 (1981).

[10]See Report to the President's Commission, 246 J.A.M.A. 2184 (1981): "When respiration and circulation have irreversibly ceased, there is no need to assess brain functions directly. When cardiopulmonary functions are artificially maintained, neurological criteria must be used to assess whether brain functions have ceased irreversibly." See also D. Meyers, Medico-Legal Implications of Death and Dying 36 (1981); Jacobson, Anderson, Speigel, *Towards a Statutory Definition of Death in Illinois*, 14 J. Mar. L. Rev. 701, 713 (1981).

[11]This conclusion is compatible with the provisions of the 1980 Uniform Determination of Death Act, 12 Uniform Laws Annotated 237 (Cum. Supp. 1983). The Act states: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." (See *In re Welfare of Bowman* (1980), 617 P.2d 731, 738; D. Meyers, Medico-Legal Implications of Death and Dying 45 (1981).) The Uniform Determination of Death Act is a model statute which was approved by the National Conference of Commissioners on Uniform State Laws and has been endorsed by the American Bar Association, the American Medical Association, the American Academy of Neurology, the American Electroencephalographic So-

In the present case, Alex B. Haymer was seven months old when he was at McGaw Hospital. He was attached to a mechanical ventilation system which ventilated his lungs, caused his heart to continue pumping and sustained some of his other purely biological functions.

Dr. Timothy B. Scarff, a neurosurgeon specializing in pediatric neurosurgery, testified during the trial court hearing that he had examined Alex B. Haymer in the pediatric intensive care unit at the hospital. His objective finding was that clinically, the child had suffered total, complete and irreversible brain death. Subjectively, he found that the child did not respond to any kind of stimuli and had no brain stem reflexes. Also, the child had no pupillary or other eye movement, and he was not breathing by himself.

Scarff also testified that he ordered an EEG, or brain wave test, and a radioactive isotope blood flow test. These tests showed that, in fact, there was no electrical activity in the brain and that there was no flow of blood to any part of the brain. After 24 hours, Scarff repeated the EEG examination and ordered an evoked response test of the brain stem. This second EEG test confirmed that there was no electrical activity in the brain. The evoked response test confirmed that there was no activity in the brain stem.

Scarff further testified that as of October 23, 1982, Alex B. Haymer had total and irreversible brain death and that this diagnosis was confirmed by two other consultants. The diagnosis of brain death applied to the entire brain. Also, Scarff testified that there are no recorded incidents of any person meeting these criteria ever regaining any function whatsoever. Scarff testified that his diagnosis and conclusions were made according to the usual and customary standards of medical practice. Scarff's testimony was uncontradicted.

■ Under the circumstances, we believe the record clearly establishes that on October 23, 1982, Alex B. Haymer sustained an irreversible cessation of total brain function, according to usual and customary standards of medical practice, and was legally dead as of that date.

■ We next address the question of whether this case should be dismissed on the basis that it became moot when Alex B. Haymer's heart stopped functioning on November 28, 1982. If the case were to be dismissed due to mootness, the date of death would remain in dispute. The trial court's order provides that the date of legal death was

ciety and the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research. A. Moraczewski & J. Showalter, Determination of Death 27-28 (1982).

October 23, 1982, but circulation and respiration did not cease until November 28, 1982, which is the same day that the heart stopped functioning. Thus, the date of death to be recorded on the death certificate, a public record, is uncertain. Moreover, since it is readily apparent that the general issue involved in the case is likely to recur, and the issue plainly involves matters of public concern, we are not required to dismiss the case even though the issue may be technically moot. See *Johnny Bruce Co. v. City of Champaign* (1974), 24 Ill. App. 3d 900, 905, 321 N.E.2d 469, 473; *Lurie v. Village of Skokie* (1978), 64 Ill. App. 3d 217, 226, 380 N.E.2d 1120, 1128.

In addition, the case should not be dismissed as moot because the very urgency which moved those in the medical profession, the county medical examiner and the State to press for prompt action here is likely to recur, making it probable that similar cases arising in the future will likewise appear to be or become technically moot by ordinary standards before they can be decided by a reviewing court. (See *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 623, 104 N.E.2d 769, 772.) Evidence gained from thousands of patients studied in many centers around the world indicates that a person attached to a mechanical ventilation system who has met the brain death criteria would not be expected to maintain a heartbeat for the period of time it would take for appellate review no matter how expeditiously the appellate process proceeds. (See F. Plum & J. Posner, The Diagnosis of Stupor and Coma 315 (3d ed. 1980); *Roe v. Wade* (1973), 410 U.S. 113, 125, 35 L. Ed. 2d 147, 161, 93 S. Ct. 705, 713.) Thus, the situation before us is clearly a situation which is " 'capable of repetition, yet evading review.' " (*Roe v. Wade* (1973), 410 U.S. 113, 125, 35 L. Ed. 2d 147, 161, 93 S. Ct. 705, 713.) We therefore decide that this case should not be dismissed because of mootness.

Accordingly, we conclude that on October 23, 1982, Alex B. Haymer sustained irreversible cessation of total brain function, according to usual and customary standards of medical practice, and that he was legally dead as of that date. The order of the circuit court is affirmed.

Affirmed.

McNAMARA, P.J., and WHITE, J., concur.