502 A.2d 1287

**COMMONWEALTH of Pennsylvania**

v.

**Kenneth Albert KOSTRA, Appellant.**

Superior Court of Pennsylvania.

Argued May 14, 1985.

Filed Dec. 31, 1985.

---

10. 42 Pa.C.S. § 9701, *et seq.*

David J. Graban, Sharon, for appellant.

Charles S. Hersh, Assistant District Attorney, Hermitage, for Commonwealth, appellee.

Before SPAETH, President Judge, and ROWLEY and WIEAND, JJ.

WIEAND, Judge:

At or about 4:00 a.m. on March 29, 1983, Kenneth Albert Kostra and several friends left a tavern after having spent the evening of the prior day and the early morning of the same day visiting licensed establishments in and around Sharon and Farrell, Mercer County. Less than a mile from the tavern, Kostra lost control of the vehicle which he was then driving. The vehicle left the road, became airborne, struck several utility poles, landed on its side, spun around and flipped upright. All passengers in the vehicle were injured. Russell Blackstock subsequently died. Kostra was tried by a jury for his part in the accident and was found guilty of homicide by vehicle,[1] driving while under the influence of alcohol,[2] homicide by vehicle while driving

1. 75 Pa.C.S. § 3732.
2. 75 Pa.C.S. § 3731(a)(1).

under the influence of alcohol,[3] reckless driving[4] and driving at an unsafe speed.[5] Post-trial motions were denied, and Kostra was sentenced to prison for not less than three years nor more than six years on the conviction for homicide by vehicle while driving under the influence of alcohol. Kostra appealed.

■ Appellant's first argument is that the Commonwealth failed to prove that he had been the legal cause of Blackstock's death. He argues that the direct cause of Blackstock's death was not the injuries received in the accident but the subsequent removal of life support systems used to keep Blackstock alive. We reject this argument.[6]

■ It is correct, as appellant argues, that the Commonwealth must prove beyond a reasonable doubt each and every element of the offense, including a causal connection between death and the wrongful act. See: *Commonwealth v. Floyd*, 499 Pa. 316, 317, 453 A.2d 326, 327 (1982); *Commonwealth v. Green*, 477 Pa. 170, 174, 383 A.2d 877, 879 (1978). The Commonwealth must prove *"beyond a reasonable doubt* that [the] death occurred as a result of injuries received in the incident or of a chain of events stemming from the incident." *Commonwealth v. Baker*, 299 Pa.Super. 241, 247, 445 A.2d 544, 547 (1982). Causation is an issue of fact for the jury. *Commonwealth v. Hicks*, 466 Pa. 499, 504, 353 A.2d 803, 805 (1976). "A defendant's

3. 75 Pa.C.S. § 3735(a).

4. 75 Pa.C.S. § 3714.

5. 75 Pa.C.S. § 3361.

6. This argument is couched in terms of an error allegedly committed by the trial court in denying a defense demurrer to the Commonwealth's evidence. However, appellant did not rest after his demurrer had been denied and presented evidence in defense. The correctness of the court's denial of the demurrer, therefore, cannot be questioned on appeal. *Commonwealth v. McNeal*, 493 Pa. 395, 397, 426 A.2d 606, 608 (1981); *Commonwealth v. Alvarado*, 333 Pa.Super. 63, 66, 481 A.2d 1223, 1224 (1984); *Commonwealth v. Kuhn*, 327 Pa.Super. 72, 79, 475 A.2d 103, 106 (1984). However, we may treat this, more properly, as a challenge to the sufficiency of the evidence. See: *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976). In doing so, we view the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth as verdict winner.

actions are the legal cause of death if they are a direct and substantial factor in bringing it about." *Commonwealth v. Paquette*, 451 Pa. 250, 254, 301 A.2d 837, 839 (1973). "So long as a defendant's actions are a direct and substantial factor in bringing about death, legal responsibility may be found." *Commonwealth v. Matthews*, 480 Pa. 33, 37, 389 A.2d 71, 73 (1978). A defendant cannot escape legal liability for homicide if his act starts an unbroken chain of causation which leads to death. See: *Commonwealth v. Robinson*, 468 Pa. 575, 584, 364 A.2d 665, 670 (1976); *Commonwealth v. Stafford*, 451 Pa. 95, 100, 301 A.2d 600, 604 (1973).

In the instant case there was evidence that the cause of death had been multiple injuries sustained in the automobile accident. These injuries set in motion a chain of circumstances directly resulting in Blackstock's death. This was sufficient to show that the accident had been a substantial factor in bringing about death and hence a legal cause of death. See: *State v. Fierro*, 124 Ariz. 182, 185, 603 P.2d 74, 77 (1979) ("The removal of the life support systems [where victim had suffered brain death] was not the proximate cause of death, the gunshot wounds were, and it was not error to find that the defendant was the cause of the victim's death."); *State v. Inger*, 292 N.W.2d 119, 124–125 (Iowa 1980) (where a victim had suffered brain death due to a serious altercation with defendant, sufficient evidence existed to find that the trauma inflicted by defendant was the proximate cause of the victim's death; a possible intervening medical error, such as premature removal from a support system, was not a defense.).

■ Appellant contends that Blackstock was not brain dead when the life support system was removed. This is a tantalizing argument, but it must ultimately fail. At common law, death occurred when respiration and circulation ceased. In more recent times, the medical profession has expanded its definition of death to include the cessation of all brain functions. This expanded definition recognizes the ability, nonexistent at common law, to monitor brain func-

tions. It also recognizes that heroic measures now available to sustain life, such as the use of life support systems and organ transplants, were also unknown to the common law. See generally: *Lovato v. District Court*, 198 Colo. 419, 425–29, 601 P.2d 1072, 1076–1078 (1979); *In re Haymer*, 115 Ill.App.3d 349, 350–52, 71 Ill.Dec. 252, 254–5, 450 N.E.2d 940, 942–943 (1983).

The legislatures of the several states, together with the courts, have followed the medical community in accepting the cessation of brain functions as an equivalent of death. In some states, the courts have held that the cessation of brain functions is equivalent to death. See generally: *People v. Eulo*, 63 N.Y.2d 341, 472 N.E.2d 286, 482 N.Y.S.2d 436 (1984). Other states have adopted the Uniform Determination of Death Act. Pennsylvania has adopted this Act which provides that "[o]nly an individual who has sustained either: (1) irreversible cessation of circulatory and respiratory functions; or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead." 35 P.S. § 10203.

The Uniform Act requires a cessation of all functions of the brain, including the brain stem. What this means appears in the opinion of the Court in *In re Haymer, supra,* as follows:

Where there is total brain death, the brain has no potential for recovery.... The cerebral cortex is the site of the highest centers of human intelligence, those concerned with the higher perceptions, and with the processes of thinking, emoting and consciousness. It may well be that lack of oxygen flow to the brain for a short period will result in total and irreversible cessation of the cortical brain functions. However, loss of oxygenated blood flow for such a period may not have a terminal effect upon the brain stem or lower brain. It is this portion of the brain which controls respiration, heart rate, blood pressure and other purely biological functions. Thus, a patient may well be rendered unconscious and incapable of recovering consciousness and any capacity

for thought, emotion, and intellectual perception, but may have the ability to breathe spontaneously and maintain pulse and circulation. In such a situation, the person has not sustained total brain death (D. Meyers, Medico-Legal Implications of Death and Dying 12, 25–27 (1981)), and thus would not have "irreversible cessation of total brain function according to usual and customary standards of medical practice." (Ill.Rev.Stat.1981, Ch. 110½, par. 302(b) [the Uniform Anatomical Gift Act]).

*Id.* at 353 n. 8, 71 Ill.Dec. at 256 n. 8, 450 N.E.2d at 944 n. 8.

In the instant case, Blackstock's final days were described via stipulation of counsel introduced at trial as follows:

(3) On the night of April 5, 1983, and during the day of April 6, 1983, the patient's condition deteriorated. His inter-cranial pressure markedly increased and exceeded his systemic blood pressure. He did not respond to measures undertaken to correct his inter-cranial pressure increase. *He became totally unresponsive to any stimuli. He showed absolutely no sign of any neurological activity.* Blood pressure also began to decrease down to 80 systolic. He was placed on dropamine-drip. Vital signs were maintained with dropamine infusion. He was elevated with the electrocardiogram which showed possible cerebral activity. However, this was not conclusive of absence of artifact. *A cerebral CT scan was performed. This showed brain stem hemorrhage.* A brain scan was performed and showed no inter-cranial blood flow. *The entire clinical picture and studies performed showed that the patient had brain death.* The family was explained the lack of any hope for any recovery. They requested that life-supporting measures be stopped.

(4) Russell Blackstock died in Northside Hospital on April 6, 1983. *The final diagnosis was* auto accident— multiple injuries, *brain stem contusion and hemorrhage,* splinetic lacerations.

. . . . .

(7) After examination of the deceased, Dr. Tochtenhagen [the Deputy Trumbell County Coroner] determined *the cause of death to be brain stem hemorrhage and inter-cranial hemorrhage* caused by the injuries resulting from the traffic accident of March 29, 1983.

(N.T. 11/21–22/83, at pp. 79–81) (emphasis added).

While this stipulation does not explicitly refer to the death of the brain stem, a review of the circumstances surrounding the victim's death suggests no other conclusion than that the brain and the brain stem were dead. The brain stem controls respiratory and circulatory functions. Blackstock's respiratory and circulatory functions, however, were being artificially maintained by life-supporting measures. When the life-supporting measures were suspended, death ensued. Thus it is evident that the brain stem was dead even before the life-support systems were removed, for the respiratory and circulatory functions were non-existent without life-support measures. The evidence established, therefore, that Blackstock was legally dead even before heroic life support procedures were discontinued.

█ Appellant also contends that judgment should have been arrested because he was not tried within the time constraints of Pa.R.Crim.P. 1100. An extension should not have been granted, he argues, when a continuance of the trial was granted because of the hospitalization of a Commonwealth witness.

The run date on the homicide by vehicle offenses was October 5, 1983; the run date on the other offenses was September 26, 1983. These run dates were extended by agreement until October 30, 1983, because of the unavailability of both counsel during the September trial term. On October 11, the Commonwealth requested a continuance and an extension of time within which to commence trial because Mary Hoagland had become seriously ill and had been hospitalized. This witness was supervisor of the chemistry department at Sharon General Hospital and had made the analysis of appellant's blood sample. Her analysis had disclosed blood alcohol of 0.196 per cent. Appellant

had previously disclosed that he would probably challenge the accuracy of this analysis; and, therefore, the Commonwealth deemed the presence of the witness essential. The trial court granted the Commonwealth's motion for continuance and extended the time for commencement of trial until November 21, 1983. Trial began on that date.

We reject the Commonwealth's contention that this issue was waived by appellant's failure to file pre-trial a motion to dismiss. Appellant's opposition to the petition to extend the time for trial was sufficient to preserve for appellate review the propriety of the trial court's extension order. *Commonwealth v. Coleman,* 477 Pa. 400, 408, 383 A.2d 1268, 1271–1272 (1978); *Commonwealth v. Lyles,* 315 Pa. Super. 194, 199, 461 A.2d 1237, 1239 (1983).

When reviewing a trial court's Rule 1100 order, this Court examines the evidence presented by the Commonwealth and any uncontradicted evidence presented by the defendant. *Commonwealth v. Lafty,* 333 Pa.Super. 428, 434–435, 482 A.2d 643, 646 (1984); *Commonwealth v. Bulling,* 331 Pa.Super. 84, 90, 480 A.2d 254, 257 (1984). An extension is proper if the trial court finds that, despite the exercise of due diligence by the Commonwealth, trial could not be commenced within the prescribed period. Rule 1100(c)(3); *Commonwealth v. Bulling, supra.* "It is well settled that the illness of a Commonwealth witness may be a proper basis upon which to grant a Rule 1100 extension as the Commonwealth should not be penalized for events and circumstances which are wholly beyond its control." *Id.,* 331 Pa.Superior Ct. at 96, 480 A.2d at 260. "So long as the witness' unavailability is through no fault of the Commonwealth, a finding of due diligence is warranted and an extension is proper." *Commonwealth v. Lafty, supra,* 333 Pa.Superior Ct. at 436, 482 A.2d at 647. The witness in this case had been hospitalized in an intensive care unit with bleeding shingles. The trial court, under these circumstances, could properly grant the Commonwealth's request for an extension of time.

■ Because the constitutionality of 75 Pa.C.S. § 3731(a)(4) (driving with a blood-alcohol reading of 0.10 per cent or greater) had not at the time of trial been ruled upon by the appellate courts, it was agreed by the parties and the trial court that the Commonwealth would prosecute appellant only under 75 Pa.C.S. § 3731(a)(1). This section of the Vehicle Code made it an offense to drive while under the influence of alcohol. Appellant presented a motion in limine in which he requested that his blood-alcohol reading should not be admitted under a § 3731(a)(1) prosecution because it was not relevant. It was irrelevant, he argued, because the reading had been obtained two hours after the fatal accident and did not establish that he was under the influence of alcohol while driving the death car.

Section 1547(d)(3) of the Motor Vehicle Code, 75 Pa.C.S. § 1547(d)(3), expressly permits the admission of chemical test results in prosecutions under Section 3731 where the reading is 0.10 per cent or more. Whether the time intervening between accident and withdrawal of blood was so great as to render the results inadmissible on grounds of relevancy required the exercise of discretion by the trial court. Our review discloses no abuse of that discretion. See and compare: *Commonwealth v. Arizini*, 277 Pa.Super. 27, 41, 419 A.2d 643, 650 (1980) (more than two hours); *Commonwealth v. Tylwalk*, 258 Pa.Super. 506, 510, 393 A.2d 473, 475 (1978) (more than four hours); *Commonwealth v. Trefry*, 249 Pa.Super. 117, 130, 375 A.2d 786, 793 (1977) (one and one-half hours), *overruled on other grounds, Commonwealth v. Lapia*, 311 Pa.Super. 264, 457 A.2d 877 (1983).

Appellant argues that the trial court erred when it discussed with the jury the absorption and expulsion of ingested alcohol by the human body. The court's jury instructions, he contends, were in the nature of scientific facts not proved by the evidence. In fact, the trial court's instructions were intended to focus the jurors' attention on the time when appellant's vehicle left the road and have them determine whether appellant at that time was under

the influence of alcohol. The trial court's discussion included, in summary, the following: (1) that alcohol travels from the stomach into the blood and through the blood into the brain; (2) that while alcohol is being absorbed into the blood it is also being expelled from the body through urination and breathing; (3) that it takes an unspecified time for alcohol to circulate through the body and register in chemical tests; and (4) that the jurors must consider the fact that the results were obtained two hours after the accident. These comments referred only to commonly known phenomena.

This Court considered similar jury instructions in *Commonwealth v. Dougherty*, 259 Pa.Super. 88, 393 A.2d 730 (1978). There, as in the instant case, the trial court, while not referring to any particular rate of assimilation or expulsion, told the jury that the time of consuming alcohol was a relevant consideration in determining whether the defendant had operated a vehicle while under the influence of alcohol. This Court said:

> The trial court did not mention any particular rate that alcohol passes through the system, but rather merely stated an obvious and well known fact. Otherwise, anyone who became intoxicated would forever remain in that condition. Since the fact that people pass alcohol out of their bodies is a matter of common and general knowledge, it was proper for the trial court to take judicial notice of it in the charge to the jury. *Commonwealth v. Milligan*, 172 Pa.Super. 607, 94 A.2d 64 (1953); *Commonwealth v. Harris*, 351 Pa. 325, 41 A.2d 688 (1945); *Commonwealth v. Henderson*, 451 Pa. 452, 304 A.2d 154 (1973).

*Id.*, 259 Pa.Superior Ct. at 92, 393 A.2d at 732. The decision in *Dougherty* is determinative.

 Appellant seeks to distinguish *Dougherty* because in that case the defendant had refused to take a breathalyzer test and the court's reference to the passing of alcohol from the body had been made in connection with the number of drinks consumed. We reject this argument. The

holding in *Dougherty* was clear. A trial court may take judicial notice of the commonly known fact that the per cent of blood alcohol is not static but varies constantly according to the time elapsing after initial ingestion. Cf. 29 Am. Jur.2d *Evidence* § 108 (1967) ("It is common knowledge that the intoxicating effect of alcohol diminishes with the passage of time after drinking the beverage."). Similarly, it is a matter of common knowledge that alcohol travels from the stomach into the blood and in this manner reaches and affects the brain. Finally, the court could properly observe that it was necessary to consider the fact that blood had been withdrawn from appellant two hours after the accident. In this manner the jury was made aware that the results of the blood test were an aid but not necessarily controlling of intoxication at the time of the accident.[7] We find no error in the trial court's jury instructions which would require the granting of a new trial.

▮▮▮ Finally, appellant attacks the constitutionality of the mandatory, minimum sentencing provisions of 75 Pa.C.S. § 3735. He alleges that this section violates the separation of powers doctrine. The constitutionality of this provision has already been upheld by this Court, and further discussion is unnecessary. *Commonwealth v. Hernandez*, 339 Pa.Super. 32, 39–40, 488 A.2d 293, 297 (1985). Accord: *Commonwealth v. Allen*, 508 Pa. 114, 494 A.2d 1067 (1985); *Commonwealth v. Wright*, 508 Pa. 25, 494 A.2d 354 (1985); *Commonwealth v. Molina*, 344 Pa.Super. 459, 496 A.2d 1196 (1985); *Commonwealth v. Cooke*, 342 Pa.Super. 58, 492 A.2d 63 (1985).

The judgment of sentence is affirmed.

**7.** The trial court instructed the jury that "[a] blood alcohol reading of .196 does not create a presumption or any inference that Kenneth Kostra was under the influence at the time that he drove this motor vehicle.... Under our statute in Pennsylvania the fact that a person is driving under the influence or that he has a count rather of anything over .10 is not a presumption or an inference but it's certainly evidence that a jury can consider with all the other evidence in determining whether a person is under the influence."