DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Toi L. Caldwell, appeals from the judgment entry of conviction and sentence for murder entered in the Summit County Court of Common Pleas. We affirm.
 I. {¶ 2} On June 9, 2005, the Summit County Grand Jury indicted Appellant on one count of murder, in violation of R.C.2903.02(B), a special felony.[1] The charge arose from an assault on the victim, Alvin Tarver, by a group of approximately six to eight individuals that included Appellant. This incident occurred on August 1, 2003. The victim sustained severe injuries, including injuries to the head and brain. The victim remained in a nursing home after the assault and did not recover. The victim passed away on March 15, 2005.
 {¶ 3} Appellant pled not guilty to the charge. The matter proceeded to trial. A jury found Appellant guilty of murder. The trial court sentenced Appellant accordingly.
 {¶ 4} Appellant timely appealed, asserting two assignments of error for review. We address these assignments of error together.
 II. First Assignment of Error
"APPELLANT'S CONVICTION FOR MURDER WAS BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW."
 Second Assignment of Error
"APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 5} In his first assignment of error, Appellant contends that his conviction for murder was not supported by sufficient evidence. In his second assignment of error, Appellant contends that his conviction is against the manifest weight of the evidence. We disagree with both contentions.
 {¶ 6} As a preliminary matter, we observe that sufficiency of the evidence and weight of the evidence are legally distinct issues. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 7} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.State v. Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id. "In essence, sufficiency is a test of adequacy." Thompkins, 78 Ohio St.3d at 386.
 {¶ 8} "While the test for sufficiency requires a determination of whether the [S]tate has met its burden of production at trial, a manifest weight challenge questions whether the [S]tate has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant asserts his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 9} Sufficiency of the evidence is required to take a case to the jury; therefore, a finding that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. "Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Id.
 {¶ 10} Appellant was convicted of murder, in violation of R.C. 2903.02(B), which states, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." See R.C. 2903.11(D); R.C.2901.01(A)(9)(a). R.C. 2903.11(A)(1), felonious assault, provides, in pertinent part, "No person shall knowingly * * * [c]ause serious physical harm to another."
 {¶ 11} Appellant does not challenge the jury's finding that he committed the offense of felonious assault upon the victim. Appellant challenges the evidence presented regarding the cause of the victim's death. Appellant argues that the victim suffered from other ailments that he asserts could have possibly "debilitated his immune system and lead [sic] to the infections that resulted in his death." A "[c]ause is an act or failure to act which in a natural and continuous sequence directly produces the (death) * * *, and without which it would not have occurred." 4 Ohio Jury Instructions (2004) 64-65, Section 409.55(1). Furthermore,
"The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural and foreseeable (consequences) (results) that follow, in the ordinary course of events, from the act or failure to act." 4 Ohio Jury Instructions (2004) 65, Section 409.55(2).
 {¶ 12} Officer Scott Christopher Lietke from the Akron Police Department testified that on the night in question he was dispatched to the area of 713 Hazel Street for a severe assault; several 9-1-1 phone calls had been made.
 {¶ 13} Delores Beatty, who resided at 713 Hazel Street in Akron, Ohio at the time of the incident, testified as to what she witnessed occur in her front yard. Ms. Beatty explained that she saw a group of individuals chase the victim down the street. She observed the group then stop in front of her house. Ms. Beatty saw the group begin to beat the victim. She specifically saw Appellant hit and kick the victim in the face and in the ribs. Ms. Beatty was later able to identify Appellant as one of the individuals that attacked the victim. She was familiar with Appellant because she had seen him in her neighborhood.
 {¶ 14} Gerald Johnson used to live on Hazel Street and witnessed the event in question. He recognized Appellant as one of the individuals beating the victim. Specifically, he saw Appellant kick the victim in the chest and stomp his head on the sidewalk. Leonard Cross also witnessed the beating. Mr. Cross stated that he saw Appellant kicking the victim with his combat boots, and that several of the individuals jumped off the three to four-foot retaining wall at the front of the property and onto the victim's head and body. Mr. Cross identified the person with the combat boots as Appellant.
 {¶ 15} Kimberlee James testified that she also witnessed Appellant beat the victim. Ms. James testified that the group chased the victim and dragged him from the front yard onto the sidewalk over the retaining wall. They beat the victim until Appellant arrived moments later, at which point Appellant joined in and started to beat him. When police sirens sounded and the group disbanded, she witnessed Appellant slowly "strut" away from the scene, as if "he was proud at what he had did [sic]."
 {¶ 16} The mother of the victim, Arletta Slaughter, testified that the victim's face was "swollen beyond almost recognition" from the beating.
 {¶ 17} Stacy Frabotta, a paramedic from the City of Akron Fire Department, testified that she responded to the scene regarding an unresponsive individual on Hazel Street. Ms. Frabotta testified that the victim was unresponsive and that his eyes were dilated, indicating significant head injury. Ms. Frabotta observed multiple head injuries, including multiple actively bleeding hematomas. She rated the victim's injuries at a six out of 15 on the Glascow scale, a head injury assessment. She explained that the score indicated that the victim had a significant head injury.
 {¶ 18} Summit County Chief Medical Examiner Dr. Lisa Kohler testified regarding her investigation, autopsy examination of the victim, and the report of autopsy findings. Dr. Kohler testified that she found evidence of both direct and indirect trauma to the brain, and that the victim had paralysis after the assault. His left arm and left leg had atrophied and contracted. He had difficulty breathing, required a trach tube, had difficulty swallowing, had to use a feeding tube in his stomach, and was never able to live independently. Dr. Kohler stated that the victim had "serious neurological impairment" following the injury.
 {¶ 19} Dr. Kohler testified that she reviewed the victim's hospital admission notes and medical records as well as the paramedics' records pertaining to the injury. She also reviewed some nursing home records. Dr. Kohler ascertained that the victim experienced unconsciousness at the scene that continued at the emergency room. At the time the victim was transferred from the hospital to the nursing home, he had not been able to move his arm, had difficulty breathing and swallowing, had to be intubated for a long period of time and had a trach tube put into his airway through his neck. Dr. Kohler explained that the injuries made the victim more susceptible to developing lung infections. His swallowing and breathing deficiencies made him prone to aspirate saliva and food into his lungs and the trach tube could allow bacteria to enter into his system, which would make him more prone to developing infections. She testified that the nursing home records showed that the victim had developed and was treated for lung infections multiple times. Dr. Kohler confirmed that the victim's difficulty breathing and eating were related to his head injuries.
 {¶ 20} Dr. Kohler determined that the victim's cause of death was "septic syndrome due to suppurative bronchopneumonia and urinary tract infection due to complications of remote closed head injury." She explained in laymen's terms that "he had an infection that got into his bloodstream from the infection in his lungs and kidneys, and that those were related to the brain injury he had received sometime ago and those neurologic impairments caused by that injury." When questioned regarding her opinion based on a reasonable degree of medical certainty as to the manner and method of the victim's death, Dr. Kohler stated that he died as a result of "homicide, he was beaten or struck by another or others." Dr. Kohler further confirmed, that, "Without those initial inciting injuries, he would not have died from bronchopneumonia in March of 20005 [sic]."
 {¶ 21} Dr. Kohler confirmed that the records indicated the victim was under continuous care from the date of the injury to his death. Dr. Kohler stated, based on her observations from the autopsy, her review of the victim's medical records and police incident reports, "In this situation, but for the assault and the neurologic injuries he sustained back in August 2003, he would not have been susceptible to the infection that caused his death in March of 2005." She explained, "In looking at that information, I was able to create a continuous timeline in a sequence of events that showed that these injuries resulted in a situation where [the victim] became infected, the infection was able to get severe enough to cause his death."
 {¶ 22} On cross-examination, defense counsel asked Dr. Kohler whether she had brought any of the victim's medical records to court that day. Dr. Kohler responded that she brought a portion of the records; she explained that she retained the records from the victim's final three days in the nursing home. Defense counsel attempted to make an issue of the fact that Dr. Kohler only reviewed a portion of the records, to suggest that she did not conduct a proper review and did not exercise the proper discretion in deciding which records to rely upon in her investigation. Dr. Kohler testified:
"When I obtain medical records, I obtain areas that I feel are pertinent to evaluate. The records that I obtain initially to review following the autopsy, I then go through and I eliminate the portions I do not feel are relevant to my review at future dates, and the original records that I obtain and do not feel have great importance at that point are shredded and destroyed and I only maintain a portion of those medical records that I originally received."
 {¶ 23} Dr. Kohler further explained that she also reviewed the victim's hospital records that spanned in time from August 1, 2003 to August 27, 2003. As to the nursing home records, Dr. Kohler stated that she did not obtain the complete record, but her investigator obtained information from the nursing home about the victim during that time period. Dr. Kohler explained that she
"looked at the information that [she] believe[d] was relevant. * * * [I]t's important to pull out the important factors, such as any surgical intervention, any radiologic intervention and any observations of the nurses and the doctors who took care of him during the times that were most critical."
 {¶ 24} Defense counsel also questioned Dr. Kohler regarding other conditions and medical problems the victim had, such as alcohol abuse, cocaine abuse, a decubitis ulcer, chronic obstructive pulmonary disease, artherosclerosis of the coronary arteries, nephrolithiasis (kidney stones), and pre-existing emphysema. As to the artherosclerosis, Dr. Kohler clarified on re-direct examination that she indicated in her autopsy report that "there [was] no significant artherosclerosis." While defense counsel attempted to link the victim's emphysema to the pneumonia, Dr. Kohler stated that the victim's emphysema was not severe, and that only if it was severe would there have been a more likely link. Defense counsel also inquired about alcohol abuse leading to the victim's brain atrophy; Dr. Kohler clarified on re-direct that she believed the brain atrophy was "due to the injury he received rather than other events" because there were no indications that the victim had a significant alcohol problem. As to the victim's cocaine abuse and defense counsel's suggestion that such abuse could lead to a stroke, Dr. Kohler emphasized that she did not see that the victim had died as a result of a stroke.
 {¶ 25} In addition, defense counsel questioned Dr. Kohler regarding promethazine metabolites that were found in the victim's system. Specifically, counsel posed a question to suggest that this substance could cause "very serious or even prove fatal" when administered to a person with a nervous system disorder. Dr. Kohler responded on re-direct, that, even if she saw prolonged periods of promethazine in his system that would not affect her opinion
"because the other findings I have in here are of greater concern and are more likely to be a fatal injury in this individual. The bronchopneumonia is quite severe, he was being treated for sepsis and bronchopneumonia, and those would still rise above whatever chance there is of acquiring any side effects to the promethazine which was being prescribed to him for some illness that had arisen since the time of his injury."
 {¶ 26} Ultimately, Dr. Kohler testified that she took into consideration each of the medical conditions referenced by defense counsel and concluded that "[t]hey did not rise to a level of concern to be considered a cause of death." She confirmed that "[t]he closed head injury * * * is the inciting event here." She also confirmed on re-direct, "the fact that his neurologic state required that he have the hole in his neck to breathe, he was then susceptible to get such lung infections."
 {¶ 27} Appellant argues that the coroner failed to conduct a full review of the victim's medical records from his entire stay at the nursing home. Specifically, Appellant argues that the fact that Dr. Kohler only reviewed nursing home medical records from several days prior to the victim's death undermined the credibility of her testimony. Appellant insists that the coroner's conclusion as to causation was based solely on possibilities, and that this undermined the credibility of her testimony. Dr. Kohler testified as to her qualifications, and specifically, her board certification in anatomic and clinical pathology and forensic pathology and a doctor of medicine. The jury in this case had the opportunity to view the witness and adjudge her credibility and was entitled to believe one witness' testimony. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Therefore, we must give deference to the jurors' judgment, as matters of credibility are primarily for the trier of fact. See State v. Lawrence (Dec. 1, 1999), 9th Dist. No. 98CA007118, at *6.
 {¶ 28} Appellant cites State v. Johnson (1977),60 Ohio App.2d 45, in which the First District Court of Appeals of Ohio held that gross negligence or wilfull maltreatment by a treating physician is an intervening cause that will relieve a "contributing" defendant of liability. However, Appellant does not apply this law to the instant case. It is not the duty of this Court to develop arguments in support his assignments of error for an appellant. See App.R. 16(A)(7); Loc.R. 7(A)(7);Cardone v. Cardone (May 6, 1998), 9th Dist. Nos. 18349 and 18673, at *8.
 {¶ 29} Appellant was free to advance his arguments regarding the evidence to the jury during trial. Defense counsel posed questions to Dr. Kohler on cross-examination regarding other possible causes. However, we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice when it synthesized all the medical testimony regarding causation and determined that the victim's death was the proximate result of Appellant's assault.
 {¶ 30} Based upon our thorough review of the record, this Court cannot conclude that the jury lost its way and created a manifest miscarriage of justice when it found Appellant guilty of murder. See Otten, 33 Ohio App.3d at 340. Accordingly, we find that Appellant's conviction for murder was not against the manifest weight of the evidence.
 {¶ 31} Having found that Appellant's conviction was not against the manifest weight of the evidence, we also conclude that there was sufficient evidence to support the jury's verdict in this case with respect to the offense. See Roberts, supra.
 {¶ 32} Appellant's first and second assignments of error are overruled.
 III. {¶ 33} Appellant's first and second assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J., Whitmore, J., concur.
[1] On June 21, 2005, Appellant was charged through a supplemental indictment on one count of engaging in criminal gang activity, in violation of R.C. 2923.42(A), a second-degree felony. This charge was later dismissed.